

1   GREENFIELD & GOODMAN, LLC
    Richard D. Greenfield
2   whitehatrdg@earthlink.net
    Ilene Freier Brookler (SB No. 269422)
3   ibrookler@gmail.com
    250 Hudson Street-8th Floor
4   New York, New York 10013
    Telephone: (917) 495-4446
5
    CUNEO GILBERT & LADUCA LLP
6   Sandra W. Cuneo (SB No. 110388)
    scuneo@cuneolaw.com
7   11620 Wilshire Boulevard, Suite 900
    Los Angeles, CA 90025
8   Telephone: (310) 582-5939
9   CUNEO GILBERT & LADUCA LLP
    Jonathan W. Cuneo
10  jonc@cuneolaw.com
    Matthew E. Miller
11  mmiller@cuneolaw.com
    507 C Street, N.E.
12  Washington, DC 20002
    (202) 789-3960
13
    *Attorneys for Plaintiff*
14
                   **UNITED STATES DISTRICT COURT**
15
               **CENTRAL DISTRICT OF CALIFORNIA**
16
17  WILLIAM A. SOKOLOWSKI,           )    **SACV 13 - 01277 AG (FFMx)**
    individually and on behalf of all others  )    Case No. 13-civ-
18  similarly situated,              )
                                     )
19              Plaintiff,           )
          vs                         )    **COMPLAINT FOR BREACH**
20                                   )    **OF FIDUCIARY DUTY, AND**
    WESTERN DIGITAL                  )    **AIDING AND ABETTING**
21  CORPORATION, LODI VENTURES,      )    **BREACH OF FIDUCIARY**
    INC., KEVIN C. DALY,             )    **DUTY**
22  MANOUCHEHR MOSHAYEDI,            )
    MEHRDAD MOSHAYEDI, RAJAT         )    **CLASS ACTION**
23  BAHRI, F. MICHAEL BALL,          )
    MATTHEW WITTE, CHRISTOPHER       )    **DEMAND FOR JURY TRIAL**
24  COLPITTS, and STEC, INC.         )
                                     )
25              Defendants           )
                                     )
26              and                  )
                                     )
27  STEC, INC.,                      )
                                     )
28              Nominal Defendant.   )
                                     )

1    Plaintiff William A. Sokolowski, by his undersigned counsel, alleges the
2  following upon personal knowledge as to himself and his own acts, and upon
3  information and belief as to all other matters.[1]  Plaintiff's information and belief as
4  to allegations concerning matters other than himself and his own acts is based upon
5  an investigation by his counsel, which included, among other things (i) review of
6  documents filed publicly by STEC with the Securities and Exchange Commission
7  (the "SEC"); (ii) review and analysis of press releases, news articles, earnings
8  conference call transcripts and other public statements issued by or concerning
9  STEC; (iii) review and analysis of research reports issued by financial analysts
10  concerning STEC's securities and business; (v) review and analysis of news
11  articles, media reports and other publications concerning the computer industry;
12  (vi) review of the Court's orders and other documents filed of record in *In re*
13  *STEC, Inc., Securities Litigation*, No. SACV 09-0103-JVS (MLGx)  (C.D.
14  Cal.)("Securities Litigation")[2] (vii) review of the SEC's Complaint in *Securities*
15  *and Exchange Commission v. Manouchehr Moshayedi*, Case No. SACV12-1179
16  JST (MLGx) (C.D. Cal.) (the "SEC Litigation"); and review of documents
17  produced to date in the matter styled *Sokolowski v. Manouchehr Moshayedi, et al*,
18  No. 12-1862 (C.D. Cal.) ("*Sokolowski I*"). Plaintiff believes that substantial
19  additional evidentiary support for the allegations herein exists and will continue to
20  be revealed after he has a reasonable opportunity for discovery.
21    1.    Plaintiff brings this action individually and on behalf of all other
22  STEC shareholders similarly situated against the members of STEC's present

---

[1] The three Moshayedi family trusts are the respective alter egos of the three Moshayedi brothers and their knowledge is imputed to such Trusts and vice-versa (the "Trusts").
[2] Because of the substantial efforts put into drafting the Complaints in the SEC and Securities Litigation, Plaintiff has utilized and quoted directly certain allegations from, *inter alia*, the Complaint in the SEC Litigation and the Second Consolidated Amended Complaint in the Securities Litigation, both of which are incorporated herein by reference.

2

Board of Directors, Manouchehr Moshayedi ("Manouchehr"), Mehrdad Moshayedi ("Mark")[3] , F. Michael Ball, Christopher Colpitts, Rajat Bahri ("Bahri"), Matthew Witte ("Witte") and Kevin C. Daly ("Daly") (collectively, the "Individual Defendants") as well as Western Digital Corporation ("Western") and its wholly-owned subsidiary, Lodi Ventures, Inc. ("Lodi") in connection with a proposed acquisition of STEC engineered by Defendants Manouchehr and Mark with Western and Lodi, which transaction is intended to extinguish the valuable claims belonging to STEC, and described herein against certain of its present and former directors.  These claims have previously been asserted derivatively on behalf of STEC by Plaintiff and certain other investors.  The release of these claims will be effected primarily for the benefit of Manouchehr, Mark and Masoud "Mike" Moshayedi ("Mike") and three family trusts (the Mehrdad Moshayedi Trust, Manouch Moshayedi Trust and the Masoud Moshayedi Trust, collectively referred to as "the Trusts")  and gives no credit to such otherwise valuable claims which presently exist. Indeed, the value of the claims the Moshayedi brothers are attempting to be extinguished by causing the Company to be sold well exceeds the entire consideration Western and Lodi are expected to pay for the entire Company; i.e. approximately $340 million.

2.     The underlying claims possessed by STEC arise from insider trading on a massive scale as part of a fraudulent scheme perpetrated by Defendants Manouchehr and Mark on behalf of themselves, their brother Mike and the Moshayedi family trusts to deceive the investing public by making materially false and misleading statements regarding the true financial and operating condition of STEC, and by intentionally concealing material facts concerning the Company's

---

[3] Defendants Manouchehr and Mark are sued herein individually, as agents and representatives for their brother, Masoud Moshayedi ("Mike") and three Moshayedi family trusts, *de facto* controlled by the respective Moshayedi brothers.

1   violations of, *inter alia,* SEC rules and accounting principles, all of which caused

2   STEC's reported revenue and profits to be overstated artificially and by material

3   amounts. At all times relevant, the members of the Company's Board knew or

4   should have known the material facts that STEC's financial statements were not

5   prepared in conformity with GAAP and that PWC's audits of them were not

6   prepared in conformity with GAAS.[4] In the wake of such acts and practices,

7   among other litigation, Plaintiff commenced *Sokolowski I* in this Court, seeking (1)

8   a recovery for the Company of its damages from certain present and former

9   officers, directors and related persons, , including recovery of the proceeds of the

10  Moshayedis' insider trading and other unjust enrichment, and (2) recovery of his

11  personal damages under the federal securities laws against Defendants

12  Manouchehr, Mark, and Bahri, and one of the other senior officers, Raymond D.

13  Cook ("Cook")  (collectively hereinafter defined as the "Securities Fraud

14  Defendants"). The claims set forth herein are interrelated with those alleged in

15  *Sokolowski I* and, in part, should be litigated concurrently.[5]

16  **I.      NATURE AND SUMMARY OF THE ACTION**

17          3.      As detailed below, the underlying claims that constitute the most

18  valuable assets held by STEC arise principally from the conduct of two brothers,

19  Defendants Manouchehr and Mark who, as co-founders of the Company with a

20  third brother, Mike, and key officers of the Company, using and appropriating to

21  themselves STEC's proprietary information not available to the public, sold half of

22  their stock in the Company for $267.8 million in a secondary offering (the

23  "Offering") after they and Cook had made a series of knowing misstatements and

24

25  ───────────────

26  [4] The Company typically "spoke" through Defendant Manouchehr and he and all
    of the Board of Directors were controlling persons with respect to the Company's
    filings with the SEC, press releases and other disseminations to the public.

27  [5] At an appropriate time, Plaintiff may ask the Court for leave to file a
    Consolidated Complaint in *Sokolowski I* .

28

4

misleading omissions, including artificially manipulating the Company's reported revenues and earnings, that artificially doubled the price of STEC stock and/or otherwise kept it at artificially high prices which were unjustified given STEC's true financial and operating condition.

4.     Subsequent to the Moshayedi brothers' sale of their stock in the Offering in August 2009 and otherwise during 2009, as the falsity of their statements and omissions ultimately became known, the price of the Company's stock collapsed causing Plaintiff significant damages.

5.     On July 19, 2012, after the SEC commenced a formal investigation, it commenced suit against Defendant Manouchehr based upon, *inter alia*, his violations of the federal securities laws. The trial of such action is scheduled to commence in November, 2013.

6.     Upon information and belief, although Mike was not an officer or director of the Company in 2009, Defendants Manouchehr and Mark shared with their brother Mike material inside, proprietary information which Mike appropriated and, thereafter, sold directly and/or indirectly more than one million of his STEC shares to an unsuspecting public in addition to the shares sold by his brothers through their respective Trusts in the Offering and otherwise. Moreover, upon information and belief, Defendants Manouchehr and Mark similarly shared inside information with their friends and confidantes, Bahman Fakhimi and Hossein Arjomand, both of whom are believed to have profited unjustly therefrom.

7.     Compounding their individual wrongdoing as set forth herein, the STEC Board and, in particular, its Compensation Committee consisting of Defendants Ball, Bahri and Witte, caused STEC to pay out bonuses for 2009 to Defendants Manouchehr, Mark and Cook in the amounts of $772,500, $273,000 and $150,000, respectively, purportedly because they "achieved all of their performance objectives" in 2009. Such bonuses were wholly unjustified and a waste of the Company's assets since the members of the Compensation

1   Committee, indeed each members of the 2008-09 Board, knew and did not disclose

2   that Defendants Manouchehr, Mark and Cook had each actively manipulated the

3   Company's earnings and projections and otherwise deceived the investing public

4   in substantial part, to facilitate the Moshayedi brothers' ability to unload massive

5   amounts of their STEC stockholdings (directly and through the Trusts controlled

6   by them) at artificially high prices.   These claims of corporate waste are valuable

7   assets currently held by STEC.

8           8.      This is an action brought by Plaintiff, who purchased 5,000 shares of

9   STEC common stock during the period of the underlying wrongdoing alleged

10  herein and who has owned STEC shares continuously through the present,

11  individually and on behalf of a Class of STEC shareholders for the damages caused

12  by the prospective Merger which will result in the extinguishment of the valuable

13  claims owned by STEC.  The underlying claims belonging to STEC arise from,

14  *inter alia*, the Individual Defendants' breaches of fiduciary duty, breaches of the

15  duty of loyalty, violation of California Corporations Code §25402, waste of

16  corporate assets, and/or unjust enrichment (including trading on inside

17  information) and against Mike and the Moshayedi Trusts for unjust enrichment

18  (including trading on inside information) as more fully set forth in the Complaint

19  in *Sokolowski I*. The conduct of the Company's senior management and Board and

20  the attendant SEC and shareholder litigation so weakened and demoralized the

21  Company that it became vulnerable to a sale of the Company orchestrated by the

22  Moshayedis, such as the proposed transaction with Defendants Lodi and Western

23  as described below.

24          9.      During the First Relevant Period, STEC was a manufacturer of data

25  storage devices for computer systems.  STEC's customers included original

26  equipment manufacturers ("OEMs") such as EMC, IBM, Hitachi, Hewlett-Packard

27  ("HP") and Sun Microsystems ("Sun"), who, in turn, manufactured high

28  performance storage and server systems for large enterprises.

10.     STEC claimed that it manufactured the industry's most comprehensive line of solid-state drives ("SSDs," also known as "flash drives"). A solid state drive is used for storing information in a computer system.  Whereas older hard disk drive ("HDD") technologies stored information on electromechanical spinning disks, an SSD has no moving parts, but instead retains information on static computer chips.  Because SSDs have no moving parts, they have certain performance advantages over HDDs; they are faster, more energy efficient and have longer service lives.  However, SSDs are significantly more expensive than HDDs.

11.     STEC's flagship product, the ZeusIOPS, was, during the Relevant Period, a high-performance SSD advertised by the Company as being able to access stored data at much faster speeds than both HDDS and other SSDs, due to the Company's proprietary architecture.

12.     The Company was founded by the three Moshayedi brothers in 1990.  Thereafter, the Moshayedis continued as STEC senior officers and directors.  At all relevant times, Defendant Manouchehr was STEC's Chief Executive Officer ("CEO") and Chairman of the Company's Board of Directors.  At all relevant times, Defendant Mark was the Company's Chief Operating Officer ("COO"), Chief Technical Officer ("CTO"), President and Secretary, as well as a member of STEC's Board of Directors and Equity Awards Committee.  Mike, formerly the Company's President, retired in 2007, but retained at that time an 8.99% ownership interest in the Company and was kept by his brothers fully informed as to STEC's true financial and operating condition including "inside information" not available to the public at large.

13.     The Moshayedis continue to dominate the Company.  At the beginning of and before the First Relevant Period, they collectively held at least 45% of the Company's stock (and, together with Mike, over 50%) and caused the appointment of all of the members of STEC's Board of Directors and determined

their compensation in the form of directors' fees, stock options and otherwise. In addition, together with the members of the 2008-09 Board, they were all "control persons" with respect to STEC's Registration Statements and other documents filed with the SEC in 2009 and later, as well as other documents disseminated to the public before and during the First Relevant Period. Notwithstanding the substantial sales of STEC shares from their respective holdings, they remain the Company's dominant shareholders and continue to control all of its material affairs.

14.     As detailed herein, before and during the First Relevant Period, the Individual Defendants issued or caused to be issued materially untrue statements and omissions in the name of the Company that, among other things, overstated the revenues and earnings of STEC by material amounts, created an inflated impression of STEC's revenue growth and with respect to conditions that supposedly assured a near and long term continuation and even acceleration of that growth.

15.     In summary, these materially untrue statements and omissions included:

(a)  a misrepresentation that an agreement signed by STEC with its largest customer, EMC, in the middle of 2009 for a huge volume of purchases to be made in the second half of 2009 (the "EMC Agreement" or "Agreement") was an ordinary course contract whose size was determined solely by an increase in the customer's supply requirements such that a similar volume of purchases by the same customer could be expected on a regular recurring basis;

(b)  a misrepresentation that, as of August 2009, STEC was expecting the volume of purchases by its other large customers (the "Other OEMs") to increase during the second half of 2009;

(c)  a misrepresentation that, as part of the expected increase in

8

1    purchases by the Other OEMs during the second half of 2009, STEC

2    was expecting IBM to transition to a much larger volume of purchases

3    during that period;

4    (d)  a misrepresentation that, as of September 2009, one or more of

5    the Other OEMs would have been willing and able to replace EMC as

6    the purchaser under the EMC Agreement, or to purchase a similar

7    amount of ZeusIOPS under a similar agreement;

8    (e)  the failure to disclose that, during the 2009 second quarter,

9    STEC's reported revenue would grow, and then did grow, by an

10   amount that – unknown to investors – had been artificially inflated;

11   and

12   (f) the failure to disclose that STEC's year-end and quarterly financial

13   statements were materially deceptive and false due to, *inter alia*, the

14   Securities Fraud Defendants' manipulative revenue recognition

15   practices which resulted in the Company's reported revenue and

16   earnings to be overstated by material amounts.

17   (g) the failure to disclose substantial inventory and operational

18   problems with STEC customers, Sun and HP.

19   16.   The effect of these false statements and omissions was to inflate the

20   price of STEC's stock dramatically before and during the First Relevant Period,

21   particularly during the second and third quarters of 2009.  On June 15, 2009, the

22   already manipulated price of STEC stock closed at $18.02.  By August 3, 2009,

23   because of the Securities Fraud Defendants' more recent false and misleading

24   statements and failures to disclose material facts, the market price for STEC shares

25   had roughly doubled, to $35.50.

26   17.   On August 3, 2009, when the false impression created by the

27   Securities Fraud Defendants' more recent misstatements and omissions had

28   resulted in the doubling of STEC's stock price, STEC was caused by them to

9

1   announce that it would proceed with a secondary public offering of the Company's

2   stock, comprised entirely of stock held personally by Defendants Manouchehr and

3   Mark and possibly indirectly, for the Trusts.

4        18.    Eight days later, on August 11, 2009, Defendants Manouchehr and

5   Mark sold more than 50% of their and their family trusts' holdings of STEC stock

6   in the Offering, and received thereby a total of $267.8 million. In breach of their

7   duty of loyalty to STEC and its shareholders, the members of the 2008-09 Board

8   put their obeisance to the Moshayedis first and not only signed the material

9   documents that allowed the Offering to take place but actively supported it. By

10   doing so, they subjected STEC to litigation by investors who purchased such

11   shares in the Offering and thereafter and liability for the damaged flowing

12   therefrom as well as subsequent wrongdoing as described herein.

13        19.    The Offering was the biggest insider stock liquidation in the history of

14   STEC, and a departure from the pattern of the Moshayedis' other recent sales of

15   STEC stock.[6] Excluding the STEC shares sold separately by Mike, the number of

16   shares sold by the Moshayedis in the Offering was collectively more than eleven

17   times the number of shares they sold in the months before the First Relevant Period

18   and nearly twenty times the number of shares they sold in all of 2008.

19        20.    Seven months later, as the price of STEC's stock was hitting a new

20   low, the Company announced that the SEC was conducting a formal investigation

21   involving trading in the Company's securities, and that the SEC had issued

22   subpoenas to certain of its employees in connection with that investigation,

23   including two of the Company's top officers: Defendant Manouchehr, the

24   Company's CEO, and Defendant Mark, the Company's' President and COO.

25

26

27   [6] Such shares were sold by them and/or the Trusts. At all times relevant herein,
each of the Moshayedi brothers controlled the Trusts in their respective names.

28

## II.    JURISDICTION AND VENUE

21.    This Court has subject matter jurisdiction based on  28 U.S.C. § 1332, as Plaintiff is a citizen of the State of New Jersey and each of the Defendants is a citizen of a state other than New Jersey, the amount in dispute exceeds $75,000, and the aggregate amount in dispute in this class action exceeds $5,000,000.

22.    Venue is proper in this District because Defendant STEC maintains it principal place of business within this District, the Individual Defendants conducted and conduct business in this District and many of the acts giving rise to the violations alleged herein, including the preparation and dissemination of materially false and misleading information and omissions of material facts, occurred in substantial part in this District.

## III.    THE PARTIES

### A.    Plaintiff

23.    Plaintiff William A. Sokolowski is an individual and citizen of New Jersey who, among other transactions in the Company's shares, purchased 5,000 shares of STEC common stock, during the First Relevant Period. Since his initial purchase, he has owned STEC shares continuously through the date of this Complaint.

### B.    Defendant STEC

24.    Defendant STEC is a California corporation with its principal place of business located at 3001 Daimler Street, Santa Ana, California.  STEC purported to be a leading global provider of solid-state computer memory drive technologies and solutions tailored to meet the high-performance, high-reliability needs of OEMs, such as EMC, IBM, HP, Hitachi and Sun.  During the First Relevant Period, STEC's core business was its enterprise scale SSDs, such as the ZeusIOPS. STEC claimed to manufacture the "most comprehensive line" of SSDs in the storage industry.   No claims are asserted herein against STEC, but STEC is a necessary party in order to effect certain elements of relief.

## C.    The Individual Defendants and Other STEC Insiders

25.    Defendants Manouchehr and Mark and their brother Mike founded STEC, then named Simple Technology, Inc., in 1990.  The Company grew rapidly through acquisitions and expansion both domestically and abroad.  In September 2000, the Company went public.  In 2007, STEC divested its Consumer Division, and introduced its high-end, flagship product, the ZeusIOPS.

(a) At certain relevant times Defendant Manouchehr was CEO, Chairman of STEC's Board of Directors and a member of the Equity Awards Committee. During the First Relevant Period, Defendant Manouchehr signed and certified STEC's SEC filings pursuant to Sections 302 and 906 of the Sarbanes-Oxley Act of 2002, including, without limitation, the Company's quarterly report for the second quarter of 2009  and STEC's 2009 Form 10-K.  He also signed documents integral to the Offering, including the STEC Registration Statement on Form S-3 and the Prospectus contained in the Registration Statement.  Defendant Manouchehr sold 4.1 million shares of his STEC common stock for $133,920,000 in the Offering. Although Manouchehr was replaced as Chairman of the Company, for all material intents and purposes, he continued to run STEC and control its Board.

(b) At all relevant times, Defendant Mark was STEC's President, COO, CTO, and Secretary, as well as a member of the Company's Board of Directors and a member of the Equity Awards Committee.  During the both the First Relevant Period and thereafter, Defendant Mark signed STEC's SEC filings, including, without limitation, documents integral to the Offering including the Registration Statements, and the 2009 Form 10-K Annual Report.  Defendant Mark sold 4.1 million shares of his STEC common stock for $133,920,999 in the Offering.

(c) Cook was first hired by STEC in November 2008.  At all times during the First Relevant Period, he was STEC's Chief Financial Officer ("CFO") and

12

Principal Accounting Officer.  Cook signed STEC's SEC filings during the First Relevant Period, including without limitation, its Registration Statements, the 2009 second quarter 10-Q, the 2009 second quarter Earnings Release, the 2009 third quarter 10-Q, the 2009 third quarter Earnings Release, the 2009 Form 10-K Annual Report, the 2009 fourth quarter Earnings Release and STEC's September 10, 2009, letter to the SEC.

(d) Defendants Rajat Bahri, Christopher Colpitts, F. Michael Ball, and Witte, along with former directors Robert M. Saman ("Saman") and Dan Moses ("Moses") were, during the First Relevant Period, members of the Company's Board (collectively referred to as "the 2008-09 Board") and purported to be independent when, in fact they were not. Although each of them owed a duty of loyalty to STEC and all its shareholders, each was beholden to the Moshayedis and acted as their *de facto* agents on the Board, in connection with the Offering, their handling of Plaintiff's pre-suit demands and otherwise.

(e) Mike, although not an officer or director of STEC during the First Relevant Period, is alleged to be the recipient of material inside information to unjustly enrich himself and his Trust, one of the Trusts.

(f) Defendant Daly is nominally STEC's Chairman. In fact, Defendant Manouchehr, who resigned such positions, still has operational control of STEC and is *de facto*, Chief Executive Officer. Defendant Daly is named herein solely with respect to the proposed sale of STEC as described herein and is not one of the Securities Fraud Defendants or liable to the Company for any of the conduct which took place during the First Relevant Period.

26.    Because of their positions with the Company and/or the size of their direct and indirect STEC stockholdings, the Individual Defendants, and Cook, Saman and Moses, possessed the power and authority to control the contents of STEC's filings with the SEC, documents provided to STEC shareholders and to the investing public, press releases, and presentations to securities analysts, portfolio

managers and institutional investors during the First Relevant Period.  They either participated in the preparation and/or were provided with copies of the Company's reports and press releases alleged to be deceptive prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Moreover, Defendants Manouchehr, Mark, and Bahri, and Cook, personally signed and vouched for STEC's Registration Statements on Form S-3 filed with the SEC in connection with the Offering and STEC's 2009 Form 10-K Annual Report. Because of their positions with the Company and their access to material non-public information, they knew that material adverse facts specified herein were being concealed from and/or misrepresented to the investing public, and that the positive representations being made in the foregoing documents and otherwise were then materially false and misleading. Moreover, each member of the Board was informed by Defendants Manouchehr and Mark of the truth with respect to STEC's business dealings with  EMC Corp. and concealed material business operational/inventory problems in connection with STEC customers HP and Sun.

27.    As officers, directors and controlling persons of a publicly-held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, traded on NASDAQ, and governed by the provisions of the federal securities laws, the Securities Fraud Defendants each had a duty promptly to disseminate accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings, and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly traded common stock would be based on truthful and accurate information.  The Securities Fraud Defendants' misrepresentations and omissions of material facts before and during the First Relevant Period violated these specific

Case 8:13-cv-01277-JVS-AN   Document 1   Filed 08/21/13   Page 15 of 102   Page ID #:36


requirements and obligations which caused damage to STEC and those who invested in its shares.  The Securities Fraud Defendants are, therefore, liable for the false and misleading statements identified herein as alleged in *Sokolowski I* including, *inter alia*, those contained in the Company's S-3 Registration Statements filed with the SEC in connection with the Offering.

### C.    The Trusts

28.    Each of Defendants Manouchehr, Mark and Mike formed trusts for the benefit of themselves and their respective families for tax, estate planning and other reasons. Mehrdad Moshayedi Trust, Manouch Moshayedi Trust and Masoud Moshayedi Trust (collectively, the "Trusts") were the vehicles through which each of the Moshayedi brothers typically owned their STEC stockholdings and controlled the Company.

29.    The respective Trusts are *alter egos* of the three Moshayedi brothers and their personal knowledge is thereby imputed to such Trusts and *vice versa*.

### D.    Defendants Western and Lodi

30.    Defendant Western is a Delaware corporation of which Lodi, a California corporation, is a wholly-owned subsidiary with which Western intends to merge STEC into should its sale be consummated.

### E.    Non-Party PWC

31.    (a) PWC , a Delaware limited liability partnership, is registered with the Public Company Accounting Oversight Board ("PCAOB"), pursuant to Section 102 of the Sarbanes-Oxley Act of 2002, to prepare and issue audit reports on U.S. public companies.  As one of the world's largest professional services/auditing companies, PWC provides, *inter alia*, auditing, management consulting, tax and other related services, typically on a fee basis. At all material times, PWC acted as the purportedly Independent Registered Public Accounting Firm (or, as commonly known, "auditor") of STEC's financial statements and formally reported upon its year-end statements. PWC, with annual revenues in the billions of dollars, has

developed an expertise in the auditing of "high tech" companies such as STEC over many years.  PWC has developed proprietary means of carrying out audits of companies such as STEC including addressing certain manipulative practices which manipulate a company's revenue recognition, reporting on financial statements, and dealing with audit committees of boards of directors.  In the case of STEC, PWC knew or should have known from its vast experience auditing "high tech" companies' financial statements, that the Securities Fraud Defendants had caused STEC to artificially inflate its revenues and earnings at various times during the years 2008 and 2009 by using various illicit techniques including, *inter alia*, "channel stuffing," improperly making returns of raw materials and otherwise. In this connection, pursuant to the responsibilities PWC had undertaken contractually and otherwise, its partners responsible for the STEC audits knew that its year-end and other financial statements were not prepared in conformity with GAAP and, indeed, concealed STEC's true financial condition from the investing public. If PWC had "blown the whistle" once it first came to realize that STEC's financial statements were not being prepared in conformity with GAAP (as it had, in fact, learned) and had refused to prepare and allow the public dissemination of its "clean opinions" (i.e. PWC's reports upon the annual financial statements of STEC that were made without qualification), the Securities Fraud Defendants would not have been able to perpetrate the fraud that they did or the Moshayedis and Trusts be able to sell the massive quantities of their STEC stockholdings that they did at the prices they obtained.

## IV.    THE CLAIMS POSSESSED BY STEC AGAINST CERTAIN OF ITS PRESENT AND FORMER OFFICERS AND DIRECTORS

32.    Starting prior to the First Relevant Period, when STEC's reported revenues and earnings were materially overstated by, *inter alia*, "channel stuffing" and other manipulative devices, and continuing through the time of the Securities Fraud Defendants' misstatements and omissions during the First Relevant Period,

they or STEC through such officers and/or directors, consistently informed the investing public that because, among other reasons, sales of ZeusIOPS were customized by STEC for each particular OEM customer, purchasing of ZeusIOPS by any given OEM could be expected to pass through a series of phases, with the volume of the OEM's purchases increasing by quantum leaps as the OEM passed from one phase to the next.

A.   **Misrepresentations and Omissions Concerning ZeusIOPS and the EMC Agreement**

1.   **The Securities Fraud Defendants had Consistently Described Their ZeusIOPS Business as One that Eventually Would Produce,** *in the Ordinary Course,* **Surging Sales to Each ZeusIOPS OEM Customer**

33.   STEC's Form 10-K for the year 2008, filed on March 12, 2009, states "[p]roducts sold to our customers are typically customized by our design and engineering teams to meet our customers' specific design requirements," and "[w]e offer our [OEM] customers a comprehensive technology solution from concept to design to the creation of prototypes through volume production and testing."

34.   According to STEC, the first stage for any ZeusIOPS customer involved STEC selling the customer samples for the purpose of testing and evaluation.  If the first phase was successful, it resulted in the OEM "qualifying" ZeusIOPS for use in one or more "system platforms," and increasing its purchases of ZeusIOPS.[7]

35.   In the second phase – referred to by Defendant Manouchehr during STEC's 2009 second quarter earnings conference call as a "pre-production" – the OEM marketed a system of its own that incorporated ZeusIOPS, by sending its own samples to multiple end-users, while purchasing an increased volume of

---

[7] According to STEC, an OEM made at least some purchases of ZeusIOPS even prior to ZeusIOPS having been qualified for the OEM's systems.  Thus, during STEC's 2008 second quarter earnings conference call, Manouchehr stated that STEC has sold a total of $12.2 million of ZeusIOPS "mostly for qualifications."

ZeusIOPS from STEC in order to create these samples.

36.    In the third and final phase, the OEM would receive a stream of orders for its system large and steady enough to justify what STEC's 2008 Form 10-K Annual Report referred to as "volume production" of the OEM's system – also referred to by Defendant Manouchehr during the Company's 2009 second quarter conference call as "production," "full production," and "full ramping production" of the OEM's system.  In this third and final phase, the OEM would purchase a substantially increased volume of ZeusIOPS to support the OEM's substantially increased production of its system that incorporated ZeusIOPS.

37.    In 2007, ZeusIOPS had not yet been qualified by any enterprise storage OEM. During STEC's earnings conference call on May 14, 2007, Defendant Manouchehr stated that "we are still in the qualification stages [with ZeusIOPS]," and "once this thing is qualified with customers, the volumes will be significant."

38.    On January 14, 2008, STEC announced that, after a year of "collaborative effort" between STEC and EMC Corporation (described by *The Wall Street Journal* as "the market-share leader in big computer storage systems") EMC had "selected Zeus-IOPS" for "deployment" in certain "high-end networked storage systems."  STEC stated "[t]his union signifies the first adoption of our Zeus-IOPS SSDs in the enterprise storage and enterprise computing markets."

39.    Two months later, on March 5, 2008, during the Company's year-end earnings conference call for 2007, a STEC spokesperson, at the direction of Defendant Manouchehr, stated that "[w]e expect production levels to ramp for [EMC] in future quarters."

40.    Two quarters later, in its 2008 third quarter 10-Q, STEC reported that ZeusIOPS had been "qualified" for use on the platforms of "one of the largest Enterprise Storage and Server OEMs."  During STEC's 2008 third quarter earnings conference call, Defendant Manouchehr stated that sales of ZeusIOPS during the

first three quarters of 2008 had already grown substantially compared to sales during 2007, "and this 2008 was just a sampling of what we can do in that type of product [because] we haven't yet gone into *major production*[8] of this product line. Once we do, I think the numbers will be significantly higher than what we are going today based on just eval[uations] and samples."

41.    Another two quarters later, during STEC's 2009 first quarter conference call, Defendant Manouchehr stated that ZeusIOPS was not qualified at all five of the largest enterprise storage OEMs, and indicated that EMC was not in "full production" of systems incorporating ZeusIOPS.[9]

42.    One quarter after that, during STEC's 2009 second quarter earnings conference call, Defendant Manouchehr described EMC as being in "full ramping production," and added that once the other four OEMs – described by him as being in "pre-production" – "start kicking in we will see *huge ramps* in sales of ZeusIOPS going forward."

43.    According to STEC, although the volume of a given OEM's purchases of ZeusIOPS would increase by quantum leaps as the customer passed from pre-qualification, to pre-production, to volume production, an OEM's purchases could increase – although more gradually – at other times as well, because, as stated in STEC's 2008 10-K Annual Report, "the SSD market will continue to expand over the next few years, aided by the continuation of the decline in Flash components pricing," and because the continuous development of new applications for SSDs would increase the variety of possible OEM systems

---

[8] Unless otherwise noted, the emphasis in this and other parts of this Complaint is added.
[9] The statements of Defendant Manouchehr during 2008 and 2009 quoted in this Complaint are, *de facto*, attributable as well to the other Individual Defendants, Mike and the Trusts, all of whom were aware or should have been aware of Defendant Manouchehr's deception and the true state of STEC's true revenues, earnings and business condition.

1   and interested end users.[10] Notwithstanding such purchases and orders, actual sales

2   only took place and revenues could be properly be recorded when the merchandise

3   was shipped to the purchasers irrevocably.

4        44.    Thus, as early as during the Company's May 14, 2007, earnings

5   conference call, Defendant Manouchehr noted that one ZeusIOPS customer that

6   was still in the qualification stage "wants a much larger volume for qualification

7   across their platforms," and that "customers like that will pick up significantly."

8        45.    According to STEC, the achievement of volume production by a

9   specific OEM did not mean the end of the growth in the volume of its purchases

10  from STEC, because the volume of its requirements was likely to *continue* growing

11  as ZeusIOPS was integrated into more and more of the OEM's systems for sale to

12  an increasing variety of end users – which is why, on August 3, 2009, during the

13  second quarter earnings conference call, with knowledge that what he was saying

14  would be deceptive, Defendant Manouchehr interchangeably used the terms "full

15  production" and "full *ramping* production."

16       46.    In sum, it was made clear to the investing public, principally by the

17  Moshayedis, that in the ordinary course of STEC's ZeusIOPS business, total sales

18  of ZeusIOPS were likely to grow over time and, not only were sales of ZeusIOPS

19  to any given customer likely to grow over time, but also, they were likely to exhibit

20  great spurts of growth as the customer transitioned from one phase of purchasing to

21

22

23  [10] During the Company's May 14, 2007, earnings conference call, Defendant
    Manouchehr noted that "everybody in every industry that we are seeing, small or
24  large products that they build they are not trying to integrate Flash into it."  As
    explained by *The Wall Street Journal* on January 14, 2008, EMC originally
25  expected that its systems incorporating ZeusIOPS would only be purchased by
    financial institutions needing to "handle hundreds of transaction a second," and,
26  during STEC's 2008 first quarter conference call, Defendant Manouchehr stated
    that systems incorporating ZeusIOPS had not yet been sent by the OEMs "to
27  anybody else besides the financial institutions."  However, Defendant Manouchehr
    immediately added, "I think as we go forward during the year[,] in the second half
28  of the year, we will see more and more applications coming up."

the next.

47.     As reported by STEC and Defendant Manouchehr during quarterly earnings conference calls, from the time of STEC's first collaborative efforts with EMC during 2007 to create EMC systems incorporating ZeusIOPS, through the second quarter of 2009 when EMC achieved "full ramping production" of such systems, STEC's revenues from ZeusIOPS sales increased from quarter to quarter, and year to year by dramatic amounts.  These reported results appeared to confirm the scenario depicted principally by the Moshayedis of steadily increasing total ZeusIOPS sales, driven by the transition of purchasers – up to this point, especially EMC – from pre-qualification, to pre-production, to volume production of systems incorporating ZeusIOPS.

48.     For the year 2007 – the year when STEC reportedly began its collaboration with EMC – STEC reported ZeusIOPS revenues of $11 million, with just the last quarter of 2007 accounting for $7 million of that total.

49.     For the next year – 2008 – STEC reported ZeusIOPS revenues of $52.7 million – making for a year-over-year increase of almost 400%.  During the Company's year 2008 earnings conference call, Defendant Manouchehr stated that "[o]ur ZeusIOPS business is growing through the roof."

50.     During the Company's year 2008 earnings conference call, Defendant Manouchehr predicted that STEC's ZeusIOPS revenues for just the first half of 2009 would match STEC's ZeusIOPS revenues for the entire year 2008.  An analyst for Capstone Investments commented that "STEC's guidance [for the first half of 2009] should be viewed as nothing short of spectacular."

51.     Halfway through 2009, STEC reported ZeusIOPS revenues of $57.7 million for just the second quarter alone – exceeding in that one quarter the total ZeusIOPS revenues reported for the entire previous year – and reported even larger ZeusIOPS revenues -- $83.4 million – for the first *half* of 2009.

52.     These spectacular reported increases in ZeusIOPS revenues were

21

driven by spectacular reported increases in ZeusIOPS sales to EMC.  Thus, during the first quarter of 2009 – the last quarter prior to the First Relevant Period – reported ZeusIOPS sales to EMC totaled $7.55 million; while during the second quarter of 2009, reported ZeusIOPS sales to EMC totaled $33.6 million – an increase of more than 300%.[11]

### 2. During the 2009 Third Quarter, the Securities Fraud Defendants Misrepresented the Nature of a New Agreement with EMC, STEC's Largest Customer.

53.    On July 16, 2009, early in the third quarter and shortly before the Offering, STEC was caused by the Securities Fraud Defendants to issue a press release announcing an agreement with "one of its largest enterprise storage customers" – later revealed to be EMC – to purchase $120 million worth of ZeusIOPS SSDs "*in the second half of 2009.*"

54.    The EMC Agreement provided for average quarterly purchases of $60 million of ZeusIOPS by EMC during each of the quarters in the second half of 2009.  Compared to EMC's ZeusIOPS purchases during the 2009 second quarter – approximately $33.7 million – the EMC Agreement provided for an increase in

---

[11] The amounts of EMC's ZeusIOPS purchases here alleged are derived from the following facts:  During the 2009 third quarter earnings conference call, Defendant Manouchehr confirmed an analyst's suggestion that EMC had purchased "$25 million" of ZeusIOPS during the 2009 *second* quarter.  However, that number can be made more precise:  According to STEC's Form 424B3 filed on August 3, 2009, EMC's *total* purchases from STEC during the 2009 second quarter accounted for 38.9% of STEC's *total* revenues for that quarter.  Because STEC's 2009 second quarter reported revenue was $86.4 million, the precise amount of EMC's 2009 second quarter purchases of ZeusIOPS cannot have been more than $33.7 million.  Defendant Manouchehr's statement demonstrates that, during this period, essentially *all* of EMC's purchases from STEC were for ZeusIOPS.  The amount of EMC's purchases of ZeusIOPS during the 2009 *first* quarter can be derived by subtracting the amount of EMC's purchases from STEC during the 2009 second quarter from the amount of EMC's purchases from STEC during the entire first half of 2009.  EMC's purchases from STEC during the entire first half of 2009, can in turn, be derived from the fact that, according to STEC's second quarter 10-Q, EMC accounted for 27.5% of STEC's total revenues during the first half of 2009.  STEC's reported revenues during the first half of 2009 totaled $149.9 million.

1    average quarterly increase over the already high level of EMC's purchases during

2    the 2009 second quarter, it was consistent with the scenario of increasing

3    ZeusIOPS sales to a customer in full production as consistently communicated by

4    the Securities Fraud Defendants (other than Daly), and was actually a much

5    smaller percentage increase than already had happened in the 2009 second quarter,

6    when EMC's ZeusIOPS purchases had increased by 300%.

7         55.    Integral to the Securities Fraud Defendants' (principally by

8    Defendants Manouchehr and Mark) conditioning the market in anticipation of the

9    Offering, they caused to be issued false and misleading information that would

10   inflate public perceptions of STEC's business prospects. Significantly, STEC's

11   July 16, 2009 press release communicated that the increased size of the average

12   quarterly purchases promised by EMC under the EMC Agreement resulted not

13   from any extraordinary circumstances or terms of the contract, but rather, from the

14   asserted fact that "sales of [EMC's] enterprise storage systems utilizing our

15   ZeusIOPS drives *have grown significantly.*"

16        56.    STEC's announcement was intended by the Securities Fraud

17   Defendants, Mike and the Trusts to be interpreted by the investing public as

18   meaning that the EMC Agreement was a contract signed in the ordinary course of

19   STEC's business (when each of them knew it was extraordinary), that the size of

20   the contract had been determined solely by a rise in the volume of EMC's

21   recurring demand for ZeusIOPS, and that, going forward, EMC would be

22   purchasing roughly $60 million of ZeusIOPS every quarter.  Thus, on the day of

23   STEC's press release, an Oppenheimer analyst reported stated his opinion based on

24   such deception:

25

26
          STEC brought out the big gun today (checks suggest
          EMC), and announced a $120 M ZeusIOPS contract for
27        2H.  Relative to our prior model [for 2H] that included
          [a] $60-$70M contribution from EMC, this news raises
          our model by $50M.  ***Looking ahead to '10, we now***
28        ***expect rev from EMC alone of > $250M.***

23

57.     In other words, based on STEC's press release, Oppenheimer was induced to believe that EMC would purchase a bit more than $60 million of ZeusIOPS *in each of the four quarters.*

58.     Not only did Oppenheimer understand STEC to be saying that the level of EMC's purchases would continue at $60 million per quarter, but also, Oppenheimer believed based upon STEC's statements that such purchases would be made under subsequent contracts similar to the EMC Agreement.  Thus, the Oppenheimer report stated that "[we] believe/suspect that a similar supply contract with EMC for all of '10 must be in the works."

59.     Following STEC's July 16, 2009 assertions regarding the EMC Agreement, the price of STEC stock rose another 15.2% or $4.20 per share in a single day, over the previous day's closing price, to close at $31.790 per share on July 16, 2009, on extraordinary high trading volume.  STEC's stock price thus reached another all-time high.

### 3.     Defendants Continued to Make Misrepresentations Concerning the EMC Agreement Following the Initial Announcement

60.     On August 3, 2009, in STEC's second quarter earnings release, the Securities Fraud Defendants repeated their July 16, 2009 announcement, stating essentially, that the EMC Agreement covered EMC's requirements for just the second half of 2009.  Thus, the earnings release stated that, during the Second Quarter, STEC had signed a "$120 million contract to supply ZeusIOPS SSDs to a major Enterprise-Storage customer *for the second half of 2009.*"

61.     On August 3, 2009, in the Offering Prospectus, included as part of the Form S-3 Registration Statement for the Offering, the Securities Fraud Defendants stated falsely:

> "We expect continued *growth* in the sales of our Flash-based SSD ZeusIOPS products through 2009 based on the *accelerated adoption* of our ZeusIOPS SSDs by most of our major enterprise-storage and enterprise-server OEM customers into their systems.  As part of this expected growth, on

24

1
2
3

> July 16, 2009 we announced *an agreement with one of our largest enterprise-storage customers for sales of $120 million of ZeusIOPS SSDs to* be delivered in the second half of 2009." [emphasis added]

4

5

6

Like the Securities Fraud Defendants' other statements about the Agreement, on

7

July 16, 2009, and August 3, 2009, not only did this statement omit the key fact

8

that the Agreement was *not* made in the ordinary course of the STEC's business,

9

but also, this statement communicated a contrary impression by describing the

10

EMC Agreement solely as the result of EMC's "adoption" of ZeusIOPS into its

11

systems and a resulting "growth" in EMC's purchases. Following consultation

12

among the Moshayedis and the lawyers (who undoubtedly knew of the materiality

13

of the Agreement and its terms) who were drafting the Registration Statements for

14

the Offering, it was decided by them that the EMC contract required to be included

15

as an exhibit to it was intentionally not to be filed, all of which exacerbated the

16

deception of the investing public.

17

62.    On August 28, 2009, again reflecting investors' intentionally induced

18

understanding that the $120 million EMC contract was made in the ordinary course

19

of STEC's ZeusIOPS business, and that going forward such contracts with EMC

20

would be repeated every six months, an analyst report published by Needham

21

stated that "[l]ooking forward, we see a high likelihood of a ***follow-on contract***

22

***order*** with at least STEC's top OEM customer in 1H10 getting signed within the

23

next 3 months."

24

63.    Eight days after the August 3, 2009, statements about the Agreement,

25

Defendants Manouchehr and Mark sold their stock in the Offering for $267.8

26

million.

27

64.    Three months after the Offering, on November 3, 2009, during

28

STEC's 2009 third quarter earnings conference call, Defendant Manouchehr

admitted that, contrary to the impression created by STEC's statements on July 16

2009, and August 3, 2009, "when we did sign the [EMC Agreement], we did – ***this***

1    *was a one-off type of a deal*," and added that "I don't think we are going to be

2    asking our customer for another commitment."

3        65.    During the Company's 2009 third quarter earnings conference call,

4    contrary to the impression created by STEC's statements on July 16, 2009 and

5    August 3, 2009 that the volume of purchasing under the EMC Agreement would be

6    repeated by EMC going forward, Defendant Manouchehr admitted that "[EMC]

7    might carry inventory of our ZeusIOPS at the end of 2009 which they will use in

8    2010."

9        66.    STEC made the same disclosure in its 2009 third quarter earnings

10    release, also filed on November 3, 2009, which stated that "[w]e recently received

11    preliminary indications that our customer [who placed a $120 million supply

12    agreement with us for shipments covering the second half of 2009] might carry

13    inventory for our ZeusIOPS at the end of 2009 which they will use in 2010."

14        67.    As shown by the following exchange between Defendant Manouchehr

15    and a securities analyst during the Company's November 3, 2009, earnings

16    conference call, the November 3, 2009 disclosure contradicted investors' prior

17    understanding that the EMC Agreement represented a new level of purchasing by

18    EMC, expected by STEC to recur every six months.  Moreover, the exchange also

19    shows that Manouchehr *knew* that investors had been led to believe that the EMC

20    Agreement covered only six month's worth of EMC's requirements.  Thus, the

21    analyst asked:

22            "If indeed EMC does carry some inventory . . . if the sell
             through *isn't as great as $120 million, that would imply
23            the first quarter would most likely be smaller than what
             analysts are modeling* at right now, is that correct?"
24            [Emphasis added]

25    Defendant Manouchehr then responded: "That is true and ***that is why***

26    ***we have put that in our release.***"

27        68.    Subsequently, on February 23, 2010, in STEC's earnings release for

28    the 2009 fourth quarter and full year, the Company made another disclosure that

26

1    lent further clarity to the misleading impression created by the Securities Fraud
2    Defendants' statements on July 16 and August 3, 2009 that the EMC Agreement
3    represented a new increased level of purchasing by EMC that would be repeated
4    going forward.  Thus, the February 23, 2010 earnings release stated, "[W]3 not
5    anticipate this inventory carryover to continue to negatively impact our sales to this
6    customer during the first *half* of 2010, as we do not expect any meaningful
7    production orders from this customer during that time."

8         69.    The fact that the information in the Company's February 23, 2010,
9    earnings release contradicted the impression that had been created by the Securities
10   Fraud Defendants' statements on July 16, 2009 and August 3, 2009 is shown by a
11   securities analyst's report published by B. Riley on February 24, 2010, which
12   stated "STEC's new guidance indicates that it expects EMC to take at least a whole
13   year to work through its $120MM July 2009 order for ZeusIOPS SSDs; ***this order
14   was envisioned as meeting six months of demand.***"

15        70.    Similarly, a securities analyst's report published by Oppenheimer on
16   February 24, 2010, stated, "Now that ***EMC's supply contract with STEC for
17   $120M is indicative of a full-year run rate v. half year***, we are resetting out '10E
18   EPS . . . and dropping our PT . . . "

19        71.    Still another securities analyst's report – this one published by
20   Deutsche Bank on February 23, 2010 – suggested that the analyst had been misled
21   regarding the ongoing level of EMC's requirements, stating "we had assumed
22   EMC's demand for SSDs was higher than it now appears . . . We now see EMC
23   revenue of roughly ***$25M/Q*** in F2H-10, which ***we believe has been EMC's true
24   demand over the past few Qs***."  Significantly, a purchase volume of $35 million
25   per quarter – the volume proposed by the Deutsche Bank analyst as EMC's "true
26   demand" – is only about *half* of the quarterly volume of purchases under the EMC
27   Agreement, which is just another way of saying that the true period covered by the
28   EMC Agreement was twice as long as investors had been led to believe.  Also

27

1   significantly, an EMC purchase volume of $35 million per quarter is only about the

2   same as the volume that EMC had reportedly purchased during the 2009 *second*

3   *quarter* ($33.6 million), the quarter that ended *just prior* to the announcement of

4   the EMC Agreement – which, in turn, was quickly followed by the Moshayedis'

5   and Trusts' sale of their stock.

6       72.    Like the Deutsche Bank report, a Thomas Weisel Partners report

7   published on February 24, 2010, expressed a belief that investors had been misled.

8   The report lowered the analyst's price target for STEC stock based on "our loss of

9   confidence in STEC management."

10      73.    Ultimately, Defendant Manouchehr himself admitted that, although

11  EMC had a certain recurring volume of demand for ZeusIOPS, in the words of the

12  Deutsche Bank analyst, EMC's "***true*** [quarterly] demand" was only about ***half*** of

13  the quarterly volume of EMC's purchases under the EMC agreement.  Thus,

14  during the 2010 first quarter earnings conference call, an analyst asked Defendant

15  Manouchehr "So maybe your normalized quarterly revenue run rate for ZeusIOPS

16  is somewhere between $30 million and $40 million.  Is that a fair statement?

17  Defendant Manouchehr answered: "I can speculate, but *those numbers seem to be*

18  *logical*."  Since quarterly purchases by the other OEM's during each of the three

19  quarters from the 2009 third quarter through the 2010 first quarter ranged from

20  $6.7 million to $10.4 million,[12] that means the "normalized quarterly"

21  requirements of EMC were [$30 million - $40 million] minus [$6.7 – 10.4

22  million], or, *at most*, about $33.3 million.

23

24

25  [12] The calculation of ZeusIOPS purchases by the other OEMs during each quarter
    of 2009 is explained below.  The amount of their purchase during the first quarter
26  of 2010 is derived from the fact that ENMC made no ZeusIOPS purchases during
    that quarter and, according to Defendant Manouchehr's statement during the 2009
27  first quarter earnings conference call, STEC's ZeusIOPS revenues during that
    quarter were $10.4 million.
28

**B.    During The 2009 Third Quarter, The Securities Fraud Defendants Made Multiple Misleading Statements And Material Omissions Regarding Sales Of ZeusIOPS To STEC's Other OEM Customers Including Sun and HP.**

     **1.    The Securities Fraud Defendants Falsely Represented That They Expected The Other OEMS To Increase Their ZeusIOPS Purchases During The Second Half Of 2009.**

74.    At the same time that the Securities Fraud Defendants made or caused to be made misstatements regarding the EMC Agreement, they also stated falsely that they expected ZeusIOPS sales to increase to most of their order OEM customers during the second half of 2009 – which, at that time, had five months left to run.  Thus, in the Offering Prospectus, filed on August 3, 2009, they caused STEC to state falsely:

> "We expect *continued growth* in the sales of our Flash-based SSD ZeusIOPS products *through 2009* based on the accelerated adoption of our ZeusIOPS SSDs *by most of our major enterprise-storage and enterpriser-server OEM customers* into their systems."  [Emphasis added]

75.    Based on STEC's 2009 second quarter earnings release, also disseminated on August 3, 2009, investors were informed that the reference in the Offering Prospectus to STEC's "major enterprise-storage and enterprise-server OEM customers" included Fujitsu and Compellent, as well as the five OEM customers previously referenced during the 2009 first quarter conference call – EMC, IBM, HP, Hitachi and Sun.  The Company's second quarter earnings release stated that one of the "highlights" of STEC's 2009 second quarter had been "accelerated adoption of the ZeusIOPS SSDs into major Enterprise-Storage Enterprise-Server OEM customers including IBM, Fujitsu, Compellent and HP." In fact, despite the public representations, the Securities Fraud Defendants knew but did not disclose serious problems with deliveries to, inter alia, HP and SUN, which were "overstocked" with STEC products.

29

a. **Subsequent Analyst Reports Reflected This Statement**

76.    Securities analysts' responses to STEC's assertion demonstrated their understanding that STEC's management was predicting continued revenue growth based on the Other OEMs increasing their ZeusIOPS purchases during the second half of 2009.

77.    On August 3, 2009, a securities analyst's report by Thomas Weisel Partners noted that STEC had given an "upbeat outlook as the growth acceleration driven by the enterprise-SSD ZeusIOPS segment continues to ramp," and that "[t]he company expects . . . enterprise storage OEMs [to] continue ramping."

78.    On August 4, 2009, a securities analyst's report issued by ThinkEquity, LLC noted that STEC's product mix had shifted toward ZeusIOPS and that "[w]e believe *2H09 should see* continuing upside to the consensus, with *ramps outside EMC*."

79.    On August 4, 2009, a securities analyst's report issued by Capstone Investments stated that "STEC's SSD revenue acceleration over the last 12-months has been nothing short of phenomenal," ZeusIOPS revenues grew during the second quarter "as largest customer EMC continues it appetite for adoption during FY09," and "[f]urther customer acceleration is likely *during 2H09* as IBM, HPQ, [Compellent] and Fujitsu all begin to ramp from sampling orders towards full production."

80.    On August 4, 2009, a securities analyst's report issued by Needham stated "STEC's string of successes continued in the June quarter, with strong growth in ZeusIOPS and impressive margins.  We expect this trend to repeat as STEC's customers ramp and deploy SSDs into the marketplace."

81.    On August 10, 2009, Wedbush Morgan ("Wedbush") initiated research coverage of STEC, with its securities analyst noting that STEC had "captur[ed] design wins at leading OEM's and had "secured at $120MM supply agreement with one of its leading customers who we believe to be EMC."  The

analyst then added that:

> "[w]e expect due to STEC's monopoly of the fibre channel SSD market (*i.e.,* with ZeusIOPS] that it will likely secure similar supply agreements with the company's other Tier 1 OEMs. We expect these announcements to be positive analyses *in the near term* driving shares higher." [Emphasis added]

Although ZeusIOPS' monopoly of the fibre channel SSD market was a reason why any customer deciding to purchase a fibre channel SSD would buy it from STEC, the timing of the expected supply agreements reported by this analyst:

> "in the near term" – clearly reflected STEC's prediction in the Prospectus of "continued growth in the sales of our Flash-based SSD ZeusIOPS products *through 2009* based on the accelerated adoption of our ZeusIOPS SSD *by most of our major enterprise-storage and enterprise-server OEM customers* into their systems." [Emphasis added]

82.    On August 16, 2009, a securities analyst's report issued by Deutsche Bank, titled, "In the lead in a rapidly growing market," reported that, in addition to the purchases of ZeusIOPS by EMC, "STEC is also ramping new business with IBM, HP, Hitachi and Sun, and *we expect these customers' volumes to grow over the next few quarters."*

83.    On September 9, 2009, a securities analyst's report issued by JPMorgan initiated coverage of STEC, describing it as "the high-growth story in our coverage universe and technology in general," and reporting as fact "the pending cascade of revenues as multiple OEM customers [of STEC's SSDs] prepare to ramp."

84.    Although, during the Company's August 3, 2009, second quarter earnings conference call, Defendant Manouchehr did say that STEC's customers other than EMC were "maybe a quarter or a two away from full ramping production," this statement did not contradict the statement in STEC's Offering Prospectus that *increased sales were expected* from the OEMs other than EMC *during the second half of 2009.* For one thing, the Securities Fraud Defendants had

31

1     never said that ZeusIOPS sales would only increase when customers were in full

2     production.  On the contrary, the Securities Fraud Defendants had consistently

3     represented that increases in sales of ZeusIOPS could be expected quarter after

4     quarter even in the absence of any OEM being in full production.  As early as

5     during the 2008 second quarter earnings conference call, before STEC had

6     announced that any of its five large OEM customers was in full production or that

7     any of the large OEM's had even "qualified" ZeusIOPS for any system, Defendant

8     Manouchehr had asserted that "we have shown *quarter after quarter* that Zeus

9     growth is [an] absolute possibility and it is happening."  For another thing, on

10     August 3, 2009, there were still five months – or almost two full quarters – left in

11     2009.  Therefore, it would be consistent with the other OEMs being "a quarter or

12     two away from full production" if they began transitioning to full production

13     before the end of the year.  This is precisely the message received by the securities

14     analyst at Capstone Investments, who reported on August 4, 2009, that "[f]urther

15     customer acceleration is likely *during 2H09* as IBM, HPQ, CML and Fujitsu all

16     begin to ramp from sampling orders *towards* full production."

17                                   **b.  The Statement was False**

18         85.    Contrary to the statement that the Securities Fraud Defendants' caused

19     to be made that the other OEMs would increase their ZeusIOPS purchases during

20     the second half of 2009, ZeusIOPS purchases by the other OEMs during the

21     second half of 2009 *dramatically shrank*, from $42.2 million in the first half of

22     2009, to only $14.7 million in the second half of 2009.[13]

23         86.    The following table (with number representing millions) shows, for

24     each quarter of 2009, (1) total sales of ZeusIOPS, (2) sales of ZeusIOPS to EMC,

25

26     _____

[13] The amount of ZeusIOPS purchases by the other OEMs has been calculated by

27     subtracting the amount of ZeusIOPS purchases by EMC from the total amount of
STEC's ZeusIOPS revenues.  The total amount of STEC's quarterly ZeusIOPS
revenues was disclosed during STEC's quarterly earnings conference calls.

28

and (3) sales of ZeusIOPS to the other OEMs:

|  | Q1 2009 | Q2 2009 | Q3 2009 | Q4 009 |
|---|---|---|---|---|
| Total ZeusIOPS Revenues | $25.7 | $57.7 | $60.7 | $74.0 |
| EMC's ZeusIOPS Purchases | $7.6 | $33.6 | $54.0 | $66. |
| The Other OEM's ZeusIOPS Purchases | $18.1 | $24.1 | $6.7 | $8.0 |

87.    Moreover, as further explained, *infra*, at the time when the Securities Fraud Defendants stated that they expected sales of ZeusIOPS to the other OEMs to grow during the second half of 2009, they knew that their statement was false, and knew that, contrary to their statement, such sales would drop – and drop dramatically.

### c.    The Statement was Knowing False When Made

88.    As demonstrated, *infra,* the Securities Fraud Defendants' knowledge, on August 3, 2009, that sales to the other OEMs would drop during the second half of 2009 is shown by the fact that, as of August 3, 2009, these Defendants already had caused the Company to order almost the exact amount of supplies – *i.e., inventory* – that ultimately was needed by STEC in order to sell the amount of ZeusIOPS to both EMC and the other OEMs that actually was sold during the second half of 2009, while leaving STEC, at the end of 2009, with the amount of inventory on hand that, according to the Securities Fraud Defendants themselves, was optimal.

### i.    The Securities Fraud Defendants' Knowledge Of The Amount Of Future Sales Was Greater For ZeusIOPS Than For STEC's Other Products

89.    Starting prior to the First Relevant Period, the Securities Fraud Defendants made clear to investors that their knowledge of the amount of future sales was greater for ZeusIOPS than for their other products.

33

90.     On March 12, 2009, during the Company's 2008 fourth quarter earnings conference call, an analyst asked Defendant Manouchehr, "[a]s your Zeus product line continues to grow as a piece of your overall mix, is this enabling you with any level of improved visibility positively."  As an example of STEC's greater knowledge of future sales when those sales are based on ZeusIOPS, Manouchehr then pointed out that, as of March 12, "[w]e already said that the first half this year, we think that we're going to surpass what we did in last year."

91.     As an example of STEC's ability to accurately estimate future sales of ZeusIOPS, during the Company's 2008 third quarter earnings conference call, Defendant Manouchehr pointed out that, as much as "6 quarters ago, " STEC had estimated that sales of ZeusIOPS for the year 2008 would total $50 million.  Six quarters – one and a half years – after making that estimate, during the 2008 fourth quarter earnings conference call, the estimate apparently was verified when STEC announced that its ZeusIOPS sales for 2008 totaled $53 million.

92.     The Securities Fraud Defendants' accurate knowledge of future demand for ZeusIOPS results from the close collaboration between STEC and its ZeusIOPS customers, as described by STEC in its January 14, 2008 press release regarding EMC, and by Defendant Manouchehr during the Company's 2008 third quarter earnings conference call – quoted, *supra,* in paragraphs 51 and 91.[14]

93.     Without this close collaboration with its customers and the resulting advance knowledge that STEC had regarding ZeusIOPS demand, the Company would not have been able to implement what its 2008 Form 10-K Annual Report referred to as STEC's "strategy of closely matching inventory levels with product

---

[14] As explained by a confidential witness in the Securities Litigation, the former Chief Technologist for Storage and Data Management at Sun, when an OEM requires supplies of SSDs, it is to the advantage of the OEM to give its supplier advance notice of its requirements, in order to avoid any bottlenecks in the chain of supply.

1    demand."

2                        **ii.    STEC Ordered Inventory In Advance In Order**
3                              **To Fill Expected ZeusIOPS Purchases**

4        94.    As disclosed in STEC's quarterly SEC filings, the majority of its

5    inventory is comprised of the raw materials that the Company needs to build it

6    products.  As also disclosed in STEC's quarterly SEC filings, in order to prepare

7    for *expected future sales* of ZeusIOPS, STEC makes "non-cancelable inventory

8    purchase **commitments**."   [Emphasis added] Thus, as stated in STEC's 2009

9    Form 10-K Annual Report, filed on February 23, 2010, STEC makes such "non-

10   cancellable inventory purchase commitments as a result of the actual and

11   *anticipated growth* in *orders* for our ZeusIOPS products."  [Emphasis added]

12       95.    Thus, during the Company's 2008 second quarter conference call, on

13   August 4, 2008, Defendant Manouchehr stated that, for STEC's SSDs:

14
15           "[*w*]*e will see good purchase orders* and forecasts from major OEMs
             that carry on up to first quarter of 2009 [*i.e.,* through two full future
16           quarters] and *as a result, we locked in all the material that was needed
             for all of that purchase order*."   [Emphasis added]

17       96.    In short, as soon as the Company knows the amount of its future

18   ZeusIOPS sales, STEC makes non-cancellable inventory purchase commitments

19   sufficient to provide for those sales; and STEC usually knows the amount of its

20   future ZeusIOPS sales at least two quarters in advance of completing the sales.

21       97.    In addition to calibrating its non-cancelable inventory purchase

22   commitments to support its future ZeusIOPS sales, STEC also calibrates its non-

23   cancellable inventory purchase commitment so as to leave STEC with a certain

24   amount of inventory at the end of each quarter. On May 11, 2009, during the

25   Company's 2009 first quarter earnings conference call, Defendant Manouchehr

26   was asked whether STEC was planning on changing its inventory level.  He

27   responded "I think our inventory will remain in the $40 million range.  I think that

28   is our goal, to keep it in the $40 million range."

                                          35

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### iii.    At The Time When The Offering Prospectus Was Issued, STEC Had Ordered The Amount Of Inventory Actually Needed For The Sales Subsequently Made During The Second Half Of 2009

98.     Based on information from STEC quarterly reports for the 2009 second, third and fourth quarters, the following chart shows both the amount of inventory ordered in a given quarter for future use, and the amount of inventory actually used in a given quarter to support the sales made in that quarter.  The amount of inventory ordered for future use is the amount of "non-cancellable inventory purchase commitments."  The amount of inventory actually used in a given quarter to support the sales made in that quarter is, essentially, the "cost-of-revenues" for that particular quarter. As shown in the preceding chart, the cost of STEC's revenues – *i.e.*, the amount of inventory actually used by the Company in order to make its sales – in the third and fourth quarters of 2009 was, in turn, $49.5 million and $52 million.  Therefore, for the entire second half of 2009, STEC's cost of revenues was $101.5 million.

| STEC Revenues and Inventory ($ 000s) | | | |
|---|---|---|---|
| Reporting Period | 2Q 2009 | 3Q 2009 | 4Q 2009 |
| Net revenues | 86,350 | 98,293 | 106,004 |
| Cost of revenues | **43,177** | **49,478** | **52,078** |
| Non-cancelable inventory purchase commitments | **103,222** | 6,859 | 14,177 |
| Inventory | | 37,656 | 35,555 | **42,739** |

99.     As also shown in the preceding chart, the non-cancelable inventory purchase commitments made by STEC in *advance* of the second half of 2009, during the second quarter of 2009, was ***$103 million***, almost exactly equal to the

36

1    cost of the total sales that STEC actually made during the second half of 2009.

2        100.   Moreover, during the 2009 third quarter when STEC was falsely

3    announcing that it expected ZeusIOPS sales to the other OEMs to increase during

4    the second half of 2009, STEC's non-cancelable inventory purchase commitments

5    were a *de minimis* $6.9 million – which was just enough to bring STEC's total

6    inventory on hand at the end of 2009 to $42.7, almost exactly equal to the $40

7    million goal announced by Defendant Manouchehr during the Company's 2009

8    first quarter earnings conference call.

9        101.   If, in August, when they made their misstatements, the Securities

10   Fraud Defendants had really expected ZeusIOPS sales to the other OEMs to

11   increase during the second half of 2009, they would have ordered inventory

12   sufficient to support such increased sales.  Instead, at the same time when the

13   Securities Fraud Defendants were publicly stating an expectation that sales to the

14   other OEMs would *increase*, they were ordering just enough inventory to provide

15   for sales of ZeusIOPS to the other OEMs that would ***drop by more than $27***

16   ***million*** during the second half of 2009, as compared to the first half of 2009.

17           **d.  Investors were surprised when the truth was partially**
                 **disclosed on November 3, 2009.**
18
                 **i.      Sales To The Other OEMS Were *Down* And**
19                          **Would Not Recover During 2009**

20       102.   On November 3, 2009, during STEC's 2009 third quarter earnings

21   conference call, Defendant Manouchehr not only admitted that the EMC

22   Agreement was a "one-off type of a deal," but also, that "the rest of the

23   [ZeusIOPS] account did not come along as fast as we had anticipated.  So,

24   therefore, ***their numbers were down.***"  [Emphasis added]

25       103.   Defendant Manouchehr added that IBM's purchases of ZeusIOPS

26   "dropped off significantly in the third quarter" and that Sun's purchase of

27   ZeusIOPS were below "normal volumes."

28       104.   During the Company's November 3, 2009, conference call, and in

37

STEC's 2009 third quarter earnings release – disseminated on the same day – STEC issued its fourth quarter revenue guidance.  The increase in fourth quarter revenues predicted by this guidance – only $2.7 to $4.7 million – was substantially less than the expected increase in fourth quarter sales to EMC under the EMC Agreement -- $12 million.  Because any increased sales of ZeusIOPS during the fourth quarter therefore would be attributable to the EMC Agreement, there would be no fourth quarter recovery of ZeusIOPS sales to the other OEMs during the fourth quarter, ZeusIOPS sales to the other OEMs during the entire second half of 2009 were not even going to *match* the level of such sales during the *first half* of 2009, much less would there be any *increase* in such sales as compared to during the first half of 2009.

ii.     **The Other OEMS Had Not Even Started Building Systems Incorporating ZeusIOPS**

105.   One securities analyst noted that these results were contrary to the Securities Fraud Defendants' prior representations regarding their ability to forecast ZeusIOPS sales.  The analyst stated:

> "***Your visibility seems to have changed.  I don't want to, I guess, use any adjectives.  Let's just say it's changed***, but when do you believe the prior visibility returns.  Is it really going to solely revolve around your largest customer or have there been some other dynamics that have kind of changed your near-term visibility here?"   [Emphasis added]

106.   Responding to this question, Defendant Manouchehr disclosed for the first time that *the other OEMs had not even started "building in SSDs into their systems*," and that, for practical purposes, they could not even be considered customers.  Manouchehr stated, "you really can't have very good visibility with having one single customer . . . we'll get to extremely good visibility once the IBMs, the Suns, the Hitachi Data Systems and the HPs of the world come along

38

1   and start building in SSDs into their systems as well."

2        107.   When another securities analyst suggested that most of the other

3   OEMs "aren't selling to any degree yet," Defendant Manouchehr responded,

4   "exactly."  Then he added that "five customers worldwide dominate the whole

5   enterprise storage markets, and that's EMC, IBM, Hitachi Data Systems, HP, and

6   Sun," and that STEC would be "back to the races" when these OEM's "customers

7   start seeing systems with SSDs on board."

8        108.   Given Defendant Manouchehr's prior statement that STEC and one of

9   its ZeusIOPS customers had needed "over a year of daily and weekly meetings . . .

10   to optimize the performance of our [ZeusIOPS] products with [the customer's]

11   system," the Securities Fraud Defendants already knew at the time of their

12   misstatements on August 3, 2009, that, as Defendant Manouchehr admitted three

13   months later, the other OEMs had not yet started to build ZeusIOPS into their

14   systems.[15]  Nevertheless, on August 3, 2009, not only did the Securities Fraud

15   Defendants cause STEC to state falsely that sales of ZeusIOPS to the other OEMs

16   were expected to increase during the second half of 2009, but also, they even failed

17   to warn investors that the other OEMS had not yet begun to build ZeusIOPS into

18   their systems.

19              **iii.**    **IBM Was Only Offering ZeusIOPS as an Option, Not as a Standard Feature**

20

21        109.   Asked by another securities analyst why IBM's ZeusIOPS "ramp is

22   slow," Defendant Manouchehr disclosed for the first time that IBM was only

23

24   _____

[15] On November 10, 2008, when a STEC spokesperson described having had "over

25   a year of daily and weekly meetings . . . to optimize the performance of our
[ZeusIOPS] products within [our customer's] system, "he was describing what he

26   considered to be standard procedure for sales of ZeusIOPS.  His point was that the
need for such a lengthy and intimate cooperation between the SSD seller and its

27   customer was a big barrier to the entry," and as Defendant Manouchehr added,
"one of the reasons why you don't see too many competitors come into this

28   market."

"selling SSDs as an option" rather than as a standard part of the IBM system.  He stated:

> "Selling SSDs as an option versus as part of the product is quite difficult . . . If you're going out there and SSD is the first thing that you are offering your customer in terms of an upgrade for your system, that might change their mind."

#### iv.    Analysts Expressed Surprise

110.   The November 3, 2009, disclosures that the other OEMs were not going to increase their ZeusIOPS purchases during the second half of 2009 caught investors by surprise.

111.   Thus, a securities analyst's report about STEC issued by Oppenheimer on November 3, 2009, stated that STEC's "results/outlook" for the third/fourth quarters were "worrisome," and that the "Q4 (Dec.) outlook for $101-$103 in rev [was] even more troubling."  The analyst went on to say "[t]he trouble is twofold: 1) sell-through at primary customer EMC; 2) longer inception in new business at HPQ/IBM. ***Both were linchpins of our Outperform thesis; now they go out of the window."*** [Emphasis added]

112.   Another securities analyst's report about STEC issued on November 4, 2009 – this one by Wedbush – was titled "Down for the Count After Last Night's Blindsided Knock out Punch; Downgrade to Neutral and Reducing PT to $18."  In addition to noting the fact that EMC "had likely built inventory of [STEC's] flagship ZeusIOPS," the report described "Q4 guidance" as "disappointing," and stated "we were ***completely caught off guard*** by the staff in the adoption rates of SSDs and its negative impact to near-term earnings and revenue."

113.   Still another securities analyst's report about STEC issued on November 4, 2009 – by B. Riley – focused on both the disclosure about EMC and "sputtering demand from STEC's other enterprise storage customers."  The report noted that:

40

1
2
3
"another stumbling block in the period is IBM, which still is expected to be the next storage customer to embrace SSDs in volume. IBM . . . is not generating meaningful revenues yet – in part, STEC stated, due to the fact that ***Big Blue is marketing the drives as an option vs. coming out and leading upgrade sales efforts with SSDs."***
[Emphasis added]

4      114.   Finally, an analyst's report about STEC by JPMorgan issued on

5   November 18, 2009, noted that, during the Company's November 3, 2009,

6   earnings conference call, "STEC attempted to convey [the] message . . . that

7   enterprise SSD adoption is still in the *early days* of the adoption phase," and that

8   "[a]s a result, we think investors are ***better prepared for more bumps*** along the

9   way *until multiple OEMs beyond EMC take product."* The report added that

10   "STEC's stock stands to languish pending greater clarity on the EMC and IBM

11   ramps."

12
13
               e.      **Investors Were Surprised Again, When The Truth Was More Completely Disclosed On February 23, 2010**

14      115.   On February 23, 2010, during its 2009 fourth quarter and year-end

15   STEC earnings conference call, the Company reported its 2009 fourth quarter

16   ZeusIOPS revenues -- $74 million – which confirmed that sales of ZeusIOPS to the

17   other OEMs during the second half of 2009 had sharply declined from what such

18   sales had been during the first half of 2009; and that ZeusIOPS sales to the other

19   OEMs in the 2009 fourth quarter were no more than 33 % of what such sales had

20   been in the 2009 second quarter.

21      116.   On February 23, 2010, in STEC's fourth quarter/end of year earnings

22   release, and during the 2009 fourth quarter/end of year earnings conference call,

23   the Company issued is revenue guidance for the first quarter of 2010 -- $33 to $35

24   million.  That guidance disclosed that ZeusIOPS sales to the other OEMs would

25   not recover even during the 2010 first quarter, and that the Securities Fraud

26   Defendants' misstatement regarding expected growth of such sales during the

27   second half of 2009 was a highly material misstatement, and not just an estimate

28   that had been off by a month or two.  In fact, on February 23, 2010, STEC also

1    announced that no revenue from EMC was expected in the 2010 first quarter,

2    which meant that the estimate of $33 to $35 million was an estimate of the total

3    amount of 2010 first quarter revenue that STEC was expecting to receive from its

4    non-EMC customers for all of STEC's products.  This was at least $17.8 million

5    less than the amount of non-EMC related revenue that STEC had received during

6    the second quarter of 2009.

7         117.   On February 23, 2010, during STEC's fourth quarter earnings

8    conference call, Defendant Manouchehr acknowledged that the statement in the

9    Offering Prospectus regarding the expected growth in ZeusIOPS sales to the other

10   OEMs had been wrong by *at least* half a year.  Thus, a securities analyst noted that

11   "it sounds like you're not expecting any [2010 first quarter] revenue from EMC.

12   But do you expect some revenue from some of your other Zeus customer?"

13   Without any apparent basis, Defendant Manouchehr initially responded that "[o]h

14   the rest of the customers, everyone is growing very slowly."  Then, more

15   revealingly, he added, "we put second half of this year as the time to see growth

16   again in this market."

17        118.   Investors were surprised by both the 2009 fourth quarter results and

18   the 2010 first quarter revenue guidance as both of these applied to other OEMs.

19        119.   Thus, on February 24, 2010, a Needham research report on STEC

20   stated it was "revisiting estimates lower once more" because, among other reasons,

21   fourth quarter ZeusIOPS revenue was "below our original estimate."  This meant

22   revenue from the other OEMs – not from EMC – was below what Needham had

23   expected, because analysts had known since the third quarter what the amount of

24   fourth quarter revenues from EMC would be, because revenues from EMC for the

25   second half of 2009 had been fixed by the EMC Agreement.

26        120.   On February 24, 2010, JPMorgan lowered its STEC stock price target

27   to $12.50 from $42, after noting that STEC's 2010 first quarter revenue guidance

28   was more than $60 million below JPMorgan's prior estimate.  As was now

42

1   apparent, after STEC's November 3, 2009, disclosures, investors already knew that

2   EMC would not be purchasing as much as $60 million in the 2010 first quarter, at

3   least a portion of JPMorgan's prior overestimate of STEC's 2010 first quarter

4   revenues had been an overestimate of revenues from the other OEMs.  JPMorgan

5   commented that "the disappearance of sustainable revenue momentum up-ended

6   our prior view" and that "[t]he flow-through effects of this reset are staggering to

7   the overall model, which is why, we are downgrading to Neutral."

8                           **f.      Too Late to Benefit Plaintiff or Other STEC**
                                    **Investors, the Securities Fraud Defendants Added a**
9                                   **Key Cautionary Statement to Their Quarterly SEC**
                                    **Filings**
10
               121.   STEC's 2009 Form 10-K Annual Report was issued on February 23,
11
    2010.  In this 10-K, for the very first time, the Securities Fraud Defendants caused
12
    STEC to add the following cautionary statement:
13
                        "[O]ur SSDs are currently offered as options in our
14                      customers' systems.  Therefore, the demand for
                        these SSDs is unpredictable and fully dependent
15                      on end user requirements.  Unless and until our
                        SSDs are offered as a standard feature in our
16                      customers' systems, our demand visibility will
                        continue to be limited."
17
               122.   The same statement has appeared in every subsequent Form 10-Q
18
    filed by STEC.  Thus, as late as November 2, 2010 – a full fifteen months after the
19
    Securities Fraud Defendants issued their false statement in the Offering Prospectus
20
    that they expected STEC to make increased sales of ZeusIOPS to the other OEMs
21
    during the second half of 2009, the Securities Fraud Defendants were still warning
22
    investors that STEC's SSDs were being offered only as "options" rather than as "a
23
    standard feature" in the systems of STEC's customers.  Investors who purchased
24
    STEC's stock during the Relevant Period, such as Plaintiff, never had the benefit
25
    of this warning.
26
                           **2.      The Offering Prospectus Failed To Disclose That IBM**
27                                  **Would Not Begin Purchasing For Volume Production**
                                    **During The Second Half Of 2009, And Was Not Marketing**
28                                  **ZeusIOPS As A Standard Feature In Its Systems.**

                                            43

123.   Shortly before the start of the Relevant Period, on May 11, 2009, during the Company's 2009 *first* quarter earnings conference call, while talking about IBM's purchases of ZeusIOPS, Defendant Manouchehr stated "we feel that come third quarter, they will go in full production in all of these products."

124.   Subsequently, on August 3, 2009, the message that IBM would soon be increasing its purchases of ZeusIOPS was reinforced by a statement in STEC's 2009 second quarter earnings release that a "highlight" of the 2009 *second* quarter had been "accelerated adoption of the ZeusIOPS SSDs into major Enterprise-Storage and Enterprise Server OEM customers, including IBM" and several other OEMs.

125.   On August 3, 2009, the Securities Fraud Defendants signed and filed the Form S-3 Registration Statement and caused the issuance of the Offering Prospectus, which stated falsely that:

> "[w]e expect continued growth in the sales of our Flash-based SSD ZeusIOPS products *through 2009 based on the accelerated adoption of our ZeusIOPS SSDs by most of our major enterprise-storage and enterprise-server OEM customers* into their systems."   [Emphasis added]

126.   The Offering Prospectus was deceptive because, in addition to the fact that, as explained, *supra*, the Securities Fraud Defendants did *not* expect ZeusIOPS sales to the other OEMs to increase during the second half of 2009, the Prospectus also failed to disclose that IBM was not expected to reach full production of systems incorporating ZeusIOPS at any time during the second half of 2009 It also did not disclose that IBM was offering ZeusIOPS only as an option, and not as a standard feature in its systems, all of which material facts were known to and concealed by each of the Securities Fraud Defendants.

127.   For the same reason that, on August 3, 2009, the Securities Fraud Defendants knew that ZeusIOPS sales to the other OEMs were not going to increase during the second half of 2009 – and, in fact, would decline during the

1    second half of 2009 – they also knew that IBM was not going to reach full

2    production of systems incorporating ZeusIOPS at any time during the second half

3    of 2009, and, in fact, would decrease its purchases during the 2009 third quarter.

4          128.   Although, during the Company's 2009 second quarter earnings

5    conference call, which also took place on August 3, 2009, Defendant Manouchehr

6    stated that the other OEMs "are taking a *little bit* longer than expected in terms of

7    full production," he did not disclose the material fact that, as he and the other

8    Securities Fraud Defendants undoubtedly knew, sales to IBM were actually

9    expected to drop during the 2009 third quarter, and that IBM was not expected to

10   reach full production at any time within the second half of 2009.

11         129.   Defendant Manouchehr also failed to disclose that IBM was offering

12   ZeusIOPS only as an "option," and not as a standard feature in its systems, the

13   reason that he subsequently gave when asked during the Company's November 3,

14   2009, third quarter conference call "why [IBM's] ramp is slow."

15         130.   Because of STEC's intimate relationship with its OEM customers –

16   especially with respect to the design of the OEMs' systems – the Securities Fraud

17   Defendants already knew, at the time of the issuance of the Offering Prospectus,

18   that IBM was offering ZeusIOPS only as an "option" and not as a standard feature

19   in their systems.

20         131.   The failure of the Securities Fraud Defendants to qualify the statement

21   in the Offering Prospectus about increased sales to the other OEMs during the

22   second half of 2009 with respect to IBM was not only material but outright

23   intentionally deceptive, as shown by the fact that, subsequent to STEC's issuance

24   of the Prospectus, on September 9, 2009, a JPMorgan securities analyst's report

25   discussing STEC's ZeusIOPS customers stated that "we look for IBM to ramp to

26   volume in 2H 2009."

27

28

1

2

### 3. STEC's September 10, 2009, Letter to the SEC Falsely Represented That One or More of the Other OEMs Was Ready to Purchase ZeusIOPS in Quantities Equivalent to Those Being Purchased Under the EMC Agreement

132. On September 10, 2009, in its publicly filed response to the SEC's inquiries concerning STEC's contracts with EMC, the Company was caused by the Securities Fraud Defendants in consultation with their legal counsel to state that "in the unlikely event a customer should default under a purchase order or other sales agreement, STEC generally believes it could find a replacement customer for the relevant product." This statement was intended to address STEC's then-current sales agreements, as well as STEC's past sales agreements, as shown by the fact that the statement was made in the present tense.

133. This statement was knowingly false when made because, as subsequently disclosed, during STEC's November 3, 2009, third quarter earnings conference call, each of the Securities Fraud Defendants knew that none of the Company's other customers could have replaced EMC under the EMC Agreement. Thus, during the November 3, 2009, conference call, Defendant Manouchehr confirmed a securities analyst's statement that STEC's other large customers besides EMC "aren't selling to any degree yet" and added that they were all "*a year behind*" EMC.

134. Moreover, during the Company's November 3, 2009, earnings conference call, when an analyst asked "are you expecting any other supply agreements from any of your other qualified customers," Defendant Manouchehr responded "I would say that IBM would be the next guy that comes along," while also admitting that IBM's purchases of ZeusIOPS – which had never been described by STEC as rising to the level of volume production – had "*dropped off significantly* in the third quarter," and that, at present, IBM could not even be

46

1    considered a "customer."[16]

2

3        **4.    The Securities Fraud Defendants' False Statement About
            Sun is a Reflection of Scienter with respect to Their
4           Misrepresentations About the Other OEMs, and Their
            Omissions about IBM**

5        135.   During the First Relevant Period, on May 11, 2009, during STEC's

6    first quarter earnings conference call, in a series of statements, Defendant

7    Manouchehr falsely represented that Sun already was in "full production" of

8    systems incorporating ZeusIOPS.

9        136.   First, Defendant Manouchehr stated that all of the five biggest

10   enterprise storage OEMs had qualified ZeusIOPS, including EMC, Sun, IBM, HP

11   and Hitachi.

12       137.   Second, Defendant Manouchehr stated that "for now we only have

13   *two* customers in full production.

14       138.   Third, and finally, Defendant Manouchehr stated that IBM, Hitachi

15   and HP "are not in full production."

16       139.   Each of the other Securities Fraud Defendants knew or should have

17   known that the foregoing statements were deceptive. As a result of these

18   statements, investors could only conclude that EMC and Sun were *both* in "full

19   production" of systems incorporating ZeusIOPS.  For example, on May 12, 2009,

20   an analyst report about STEC published by Oppenheimer stated that "EMC and

21   Sun has [sic] started volume production of ZeusIOPS-based storage servers."  Also

22   on May 12, 2009, another analyst report about STEC, published by Capstone

23   Investments, stated that "[c]urrent momentum is being driven primarily by two

24   current customers (SUN/EMC)."

25

26   [16]   Defendant Manouchehr stated "you can't have very good visibility with having
     one single customer. . . .  we'll get to extremely good visibility once the IBMs [and
27   other OEMs besides EMC] come along and start building in SSDs into their
     systems."

28

140.   Information provided by a knowledgeable confidential witness referred to in the Securities Litigation establishes that Defendant Manouchehr's statements on May 11, 2009, about Sun already having started "full production" of systems incorporating ZeusIOPS were knowingly false when made.

141.   Such Confidential Witness was stated to be an employee at Sun from January 1999 through June 2009.  From January 2005 through June 2009, he was said to be Sun's Chief Technologist for Storage and Data Management.  According to what is attributed to him in the Securities Litigation, in the Spring of 2009, Sun purchased less than 100 Zeus SSDs from STEC, at approximately $1,000 per unit – a total purchase of only $100,000 – for use solely for testing and development in Sun's series 7000 Unified Storage System.  According to such witness, up until his departure from Sun, at the end of June 2009, Sun had never ordered ZeusIOPS for volume production.

142.   Given the importance of ZeusIOPS to STEC, Defendant Manouchehr's key role at STEC and his comprehensive knowledge of STEC's ZeusIOPS business – as demonstrated during STEC's earnings conference calls – he cannot have been unaware that his statement about Sun was false.

143.   Defendant Manouchehr's subsequent efforts to disguise the falsity of his statements during the 2009 first quarter earnings conference call further supports his wrongful intent with respect to these false statements.

144.   Thus, during STEC's 2009 second quarter earnings conference call, while investors were distracted by the news regarding the EMC Agreement, Defendant Manouchehr dropped his assertion that *two* of STEC's customers were in full production – without acknowledging that he was saying anything new – and stated that "one customer [is] in production, four customers are *still in pre production*."

145.   Still later, during STEC's 2009 third quarter earnings conference call, when he was forced to admit that ZeusIOPS sales to the OEMs other than EMC

48

had declined, Defendant Manouchehr gave a purported explanation about the lack

of ZeusIOPS sales to Sun that essentially reiterated his previous false statement

that Sun had been ordering ZeusIOPS for full production:

> "In terms of **Sun, obviously Sun has been a very large customer for us over the past few quarters.** We've hit a snag with a deal [*i.e.*, a merger] that they are involved in at this point.  And once that gets through – solved, we feel that we'll be back to normal volumes that we have been doing."
> [Emphasis added]

146.    Defendant Manouchehr's willingness to knowingly make false

statements about Sun, both before and during the First Relevant Period, provides

additional support with respect to his wrongful intent regarding STEC's false

statement in the Offering Prospectus that the Company expected increased sales to

the OEMs other than EMC during the second half of 2009, and for STEC's

omission to qualify the statement in the Prospectus specifically as it regarded IBM.

## C.    The Securities Fraud Defendants Artificially Inflated STEC's 2009 Second Quarter Revenues

147.    The Securities Fraud Defendants marketed STEC to investors as, first

and foremost, a "growth" company – *i.e.*, a company producing steady revenue

growth.  Thus, in each of its Form 10-Qs filed with the SEC during the Relevant

Period, STEC stated at an early point in "Management's discussion and analysis of

financial condition and results of operations" that STEC is "focusing on certain

revenue growth initiatives."  Thus too, in its earnings releases for each of the first

three quarters in 2009, in order to stress the continuing growth of its revenues,

STEC compared its quarterly revenues, not only to its revenues from the previous

year's same quarter, but also to its revenues from the immediately preceding

quarter.

148.    After failing to do so in the fourth quarter of 2008, STEC's reported

revenues increased in the 2009 first quarter of 11.6%.  On May 11, 2009, at the

same time that STEC reported its first quarter results, it also predicted that 2009

second quarter revenues would increase again, this time by 7%-10%.  Investors

responded to such reported results by bidding up STEC's stock price by 31%.

149.   When investors are expecting a company to continuously report

revenue growth, a decline in the rate of growth or even a continuation of the same

rate of growth, particularly for a company such as STEC, may not be enough to

keep the company's stock price rising, or even enough to prevent it from falling.

Thus, despite the 2009 first quarter revenue growth reported by STEC on May 11,

2009, one month later, on June 10, 2009, an analyst's report about STEC by B.

Riley *downgraded* STEC to "neutral," starting, "we believe that easy money has

been had, and now is a good time to take some STEC off the table."

150.   Less than a week after the B. Riley downgrade, on June 16, 2009,

perhaps in response to it, STEC issued a press release announcing that it was

increasing its 2009 second quarter revenue guidance by an additional $14 million –

so that second quarter revenue was now predicted to exceed first quarter revenue

by 29%-32%.  Later in the year, on November 2, 2009, looking back, a Capstone

analyst's report would note, that "[p]reviously during '09, when investor

expectations turned more bearish STEC management delivered increased estimate

expectations (June '09)."

151.   As was also true for every other quarter in 2009, the amount of

revenue that STEC ultimately reported for the 2009 second quarter slightly

exceeded STEC's final "guidance" for the quarter. As a result of meeting and

slightly exceeding the guidance that STEC issued on June 16, 2009, STEC was

able to report record revenue growth in the quarter that ended just prior to the

Offering.  In fact, STEC's 2009 second quarter revenue was reported on the same

day that the Offering was announced.

152.   As explained further, *infra*, the Securities Fraud Defendants were able

to increase  STEC's 2009 second quarter revenue guidance by $14 million because,

at the time when the Company issued its increased guidance for the 2009 second

quarter, they were taking steps to generate $14 million worth of unearned income and undisclosed "channel stuffing" by manipulating STEC's second quarter deliveries to the other OEMs, and then manipulating the accounting for those deliveries. The manipulation of STEC's second quarter deliveries to the other OEMs is shown by the statements of confidential witnesses known to plaintiff's counsel in the Securities Litigation who were employed at STEC during the 2009 second quarter. The fact that these manipulated deliveries were used to increase STEC's 2009 second quarter reported revenue with $14 million of unearned income and undisclosed "channel stuffing" is shown by the fact that, subsequent to the 2009 second quarter, revenue from the other OEMs plunged, and it plunged by exactly $14 million – the same amount by which the Securities Fraud Defendants had increased STEC's 2009 second quarter guidance.

### 1. The Securities Fraud Defendants Caused STEC's 2009 Second Quarter Revenue to be Artificially Inflated by Recording Unearned Income and by "Channel Stuffing"

153.    As stated in the Securities Litigation, information provided by confidential witnesses who worked at STEC during the 2009 Second Quarter shows that, during the 2009 second quarter, STEC's shipments to its customers other than EMC involved practices generally used to facilitate inflating reported revenues, including the methodical generation of unearned income,[17] and

---

[17]    Under the SEC's Staff Accounting Bulletin No. 104 ("SAB 104"), which interprets FASB Concepts Statement No. 5 ("Con 5"), which, in turn, summarizes GAAP rules regarding revenue recognition, "revenue should not be recognized until it is realized or realizable and earned," and such a condition does not exist unless "delivery has occurred or services have been rendered" **and** "collectability is reasonably assured." Under SEC Rule 4-01(a) of SEC Regulation S-X, "[f]inancial statements filed with the [SEC] which are not prepared in accordance with Generally Accepted Accounting Principles [GAAP] will be presumed to be misleading or inaccurate." 17 C.F.R. §210.4-01(a)(1). Each of STEC's Form 10-Q filed during 2009 also contained a statement that "the accompanying interim condensed consolidated financial statements of STEC . . . have been prepared in accordance with accounting principles generally accepted in the United States of America ("GAAP") for interim financial information."

1    undisclosed "channel stuffing."

2    154.   In the Securities Litigation, a Confidential Witness who is stated to

3    have worked at STEC from June 2004 until July 2009, including through the entire

4    2009 second quarter, was coordinator of sales to Hewlett-Packard and in 2009

5    reported to Lorenzo Salhi, who reported directly to Defendant Manouchehr.

6    155.   This witness apparently has stated that STEC sent HP defective

7    products and falsified the failure rate in order to make STEC's sales numbers for

8    the second quarter of 2009. When STEC tested the modules, 35 (or about 10%)

9    failed.  According to the witness, Mr. Salhi replaced the failed modules and

10   returned them to HP in May or June of 2009, with a report that falsely stated only

11   two of the units had failed.  HP shipped these modules to its customers, where they

12   again failed.  The witness is quoted as saying that the modules were shipped back

13   to HP because STEC needed to make its numbers for that month or quarter.

14   According to the quoted witness, Defendant Manouchehr told Mr. Salhi, "I don't

15   care what you have to do, get those modules back to HP."

16   156.   Another way in which unearned income was created for STEC by

17   sending customers unwanted product.  For example, the witness is said to have

18   reported than when Hewlett-Packard received from STEC a shipment in which

19   10% of the products failed, HP placed STEC on a "world wide stop shipment"

20   hold.  Defendant Manouchehr nonetheless ordered that replacement product be

21   shipped to HP.  According to the witness, the modules were shipped to HP in May

22   or June of 2009 because STEC needed the sales that month/quarter.  When HP

23   received the modules, HP's procurement engineer "hit the roof" and said that

24   STEC should not have shipped them.

25   157.   Although STEC's 2009 10-K Annual Report admits that "product

26   returns would increase our inventory and reduce our revenues," the Securities

27   Fraud Defendants never caused the disclosure of the circumstances surrounding

28   such returns or their impact upon reported revenues or that such returns were an

1    integral part of the Securities Fraud Defendants'' manipulation of STEC's reported

2    revenues and earnings.

3        158.   According to another witness cited in the Securities Litigation, still

4    another deceptive practice used by STEC to create unearned revenues was to "ship

5    bricks," or empty boxes, so that they could record revenue from those phantom

6    shipments to meet revenue goals.  This Confidential Witness, who was stated to be

7    a STEC Field Application and Sales Engineer from September 2007 until

8    November 2009, including during the entire 2009 second quarter, confirmed that it

9    was STEC's practice to engage in "shipping bricks" or wrong product to

10   customers.

11       159.   A witness also apparently provided information to the effect that

12   senior management of the Company also artificially inflated STEC's revenue by

13   pressuring customers to advance into current quarter their purchases of product that

14   they would not need until a later quarter, and by failing to disclose this "channel

15   stuffing" to investors. Thus, a witness reported that Defendant Manouchehr

16   directed the witness' superior, Lorenzo Salhi, to pull all sales of products to Cisco

17   from a future quarter in 2009 to an earlier quarter.

18       160.   This witness is quoted as having stated that she was told by a Sales

19   Director, who reported to Defendant Manouchehr and who attended sales meetings

20   with him, that at those sales meetings, Defendant Manouchehr would tell everyone

21   to push sales from a future quarter to the present quarter.  This was done to make

22   the current quarter look good. This witness apparently stated that Defendant

23   Manouchehr "had his hands on everything when it came to sales."

24       161.   The witness is further quoted as stating that she was told by a STEC

25   salesperson, who worked in Houston on the HP account and reported to Lorenzo

26   Salhi (and who was in charge of Cisco sales), that "Cisco must take everything this

27   quarter" because he wanted "grand numbers" that quarter.

28

**2.    The Collapse of STEC's Revenue in the 2010 First Quarter Shows That the Company's 2009 Second Quarter Revenue Was Inflated by $14 Million Regarding Sales to Customers Other than EMC**

162.    After the 2009 second quarter, STEC's revenue growth slowed significantly, from 36% in the second quarter, to 14% in the third quarter, to 7% in the fourth quarter. Finally, in the first quarter of 2010, STEC's revenue collapsed, dropping 63.4% to $38.8 million.

163.    STEC's 2009 fourth quarter earnings release conceded that STEC did not expect "any meaningful production orders" from EMC during the 2010 first quarter. Thus, STEC's 2010 first quarter revenue represents the amount of the Company's revenue obtained from sources other than EMC, and in the absence of such revenue inflating activities as the confidential witnesses observed during the second quarter of 2009.

164.    Based on the statement in STEC's Form 424B3 filed on August 3, 2009, that EMC accounted for 38.9% of the Company's 2009 second quarter revenue, STEC's 2009 second quarter revenue derived from sources *other* than EMC was $52.8 million. This is precisely $14 million more than the revenue from non-EMC sources reported by STEC in the 2010 first quarter.

165.    The $14 million by which STEC's reported revenue for the 2009 second quarter exceeds the Company's reported revenue for the 2010 first quarter is exactly equal to the amount by which the Securities Fraud Defendants had caused the Company to increase its 2009 second quarter revenue guidance on June 16, 2009.

166.    This remarkable symmetry is strong evidence that STEC's 2009 second quarter revenue was knowingly inflated by the Securities Fraud Defendants by $14 million using the techniques reported by the confidential witnesses referred to in the Securities Litigation.

### 3. The Securities Fraud Defendants Inflated STEC's Revised 2009 Second Quarter Revenue Guidance

167.   Before the market opened on June 16, 2009 (the beginning of the Relevant Period), the Securities Fraud Defendants caused STEC to issue a press release announcing a $14 million increase in revenue guidance for a second quarter of 2009.  First quarter revenue had been $63.5 million, previous guidance for the second quarter was $68-$70 million, and the increased second quarter guidance was for revenue of $82-$84 million – an increase of $14 million.

168.   On STEC's June 16, 2009 announcement, the price of the Company's stock increased 27% in a single day to close at $22.88 per share, a $4.86 increase from the prior day's closing price of $18.02, an extraordinarily high trading volume of 10.4 million shares.  For the same reasons as explained, *supra*, showing that the revenue subsequently reported for the second quarter of 2009 was inflated by $14 million, so too this revenue was inflated, and, therefore, knowingly false.

### C. The Securities Fraud Defendants Knew that Their Misrepresentations Were False and Would Negatively Impact STEC and its Shareholders.

#### 1. Defendant Manouchehr Subsequently Admitted That the Securities Fraud Defendants Always had Known that the EMC Agreement was a One-Off Contract.

169.   On July 16, 2009, when STEC was caused by the Securities Fraud Defendants to announce the EMC Agreement, and on August 3, 2009, when the EMC Agreement was again touted, the Securities Fraud Defendants already knew or should have known that the $120 million contract was an exceptional, one-time purchase agreement, *not* indicative of a new ongoing level of demand for STEC's ZeusIOPS product by EMC, and that, going forward, EMC would *not* be purchasing similar volumes every six months.  Thus, on November 3, 2009, during STEC's third quarter earnings conference call, when Defendant Manouchehr first admitted that the EMC Agreement was "a one-off type of a deal," he did not

55

describe this fact as a new discovery.  To the contrary, he stated "So **when we did sign** the [EMC Agreement], we did – **this was** a one-off type of a deal."

>        **2.    Defendant Manouchehr's Admission Also Means the Securities Fraud Defendants Knew that EMC Would Not Continue Purchasing at the Same Volume**

170.    The Securities Fraud Defendants' knowledge on July 16, 2009 and August 3, 2009, that the EMC Agreement was "a one-off type of a deal," also was knowledge that, after the end of the period covered by the Agreement, EMC would **not** continue buying at the same volume as under the Agreement, because, as Defendant Manouchehr admitted, purchases from STEC at such a volume could not be made by any of STEC's customers unless they entered into an agreement – such as the EMC Agreement – in advance of the purchases.  Thus, during the August 3, 2009, earnings conference call, when asked by a securities analyst whether STEC would sign other agreements similar to the EMC Agreement, Defendant Manouchehr responded, "when you get to a point where the amount of components that you need are extremely large, we can't or we won't, at least, go make those commitments to our suppliers and bring the parts in on a whim.  We need to have [a] very solid forecast and **solid commitments** in order to do that." Because each of the Securities Fraud Defendants always had known that EMC would not be making any more such agreements – because the Agreement was a "one off" contract – they also always had known that EMC would not continue purchasing ZeusIOPS at volumes similar to its purchases under the Agreement.

>        **3.    STEC's Intimate Relationship With its OEM Customers Also Supports the Securities Fraud Defendants' Scienter**

171.    The knowledge of the Securities Fraud Defendants on July 16, 2009, and August 3, 2009, that after the term of the Agreement, EMC would *not* be making recurring purchases of a volume similar to its purchases under the Agreement is also supported by EMC's subsequent statement, made during its own January 6, 2010, earnings conference call, that the EMC Agreement was not

intended to cover EMC's requirement only for the second half of 2009, but, rather, "was **designed** to protect ourselves going into first quarter [2010] against what we knew would be a tight supply environment."

172.   EMC's statement on January 6, 2010, is indicative not only of EMC's knowledge, but also, of the Securities Fraud Defendants' knowledge, but also, of the such Defendants' knowledge, given Defendant Manouchehr's statement about STEC's need for advance warning regarding an OEM's large supply requirements, and given STEC's prior statements, described below, that STEC and EMC had a long-running, still ongoing, **intensely intimate** working relationship.

173.   Thus, on November 10, 2008, during STEC's 2008 third quarter earnings conference call, a STEC spokesperson stated, "the largest Enterprise Storage customer we are in production with, it took us **over a year of daily and weekly meetings** with our engineering teams, and we went through more than 30 firmware revisions to optimize the performance of our products with their system."

174.   Indeed, as far back as January 14, 2008, STEC announced that "EMC and STEC [had] collaborated . . . [o]ver the past year" – *i.e.,* starting a full two and a half years before the EMC Agreement was signed, -- declared that STEC was "delighted to **partner** with EMC," and described EMC's selection of ZeusIOPS as a "**union**" of STEC and EMC.

175.   Moreover, STEC's own statements show that its intimate relationship with its OEM customers constitutes straight through such customers' production phase.  STEC's 2008 10-K, filed on March 12, 2009, states that "[d]uring our customers' production phase, we provide extensive support which includes training, system-level design, implementation and integration support."  Indeed, as an analyst observed during STEC's 2009 third quarter earnings conference call without being contradicted by any Defendant, at that late date, a full quarter **after** the EMC Agreement had been signed, STEC *still* had its own engineers "co-located with EMC."

176.   Still further support for the scienter of Defendant Manouchehr and the other Securities Fraud Defendants is provided by the timing of his admission that "**when we did sign** the [EMC Agreement], we did – **this was** a one-off type of a deal."  This admission followed rather than preceded not only the initial, misleading explanation of the EMC Agreement, but also, the sale of nine million of their own personal shares of STEC by Defendants Mark and Manouchehr for $267.8 million as well as the shares sold by Mike and the Trusts.  Moreover, the admission followed the misstatements about the Agreement and the sale of the Moshayedis' stock so quickly that it came at the end of the same quarter in which the misstatements were made and the stock was sold, and did so despite the fact that, at the time of the admission, the EMC Agreement still had another full quarter to run.

177.   Indeed, after Defendant Manouchehr's admissions during the November 3, 2009, conference call, a securities analyst from Thrivent Asset Management indignantly pointed out to Defendant Manouchehr that "in August, you guys are [sic] sold a majority position of your stock," and then asked "are you considering buying any back?"

178.   Also significant is the fact that Defendant Manouchehr uses the term "we" in his admission.  From the beginning, Defendant Mark knew as much about the Agreement as Defendant Manouchehr did, because, as stated by a confidential witness who was one of STEC's regional sales managers at the time when the Agreement was executed and announced, both Defendants Manouchehr and Mark were heavily involved in the Company's large deals as indicated by a confidential witness in the Securities Litigation: "nothing happened at that place without those two."[18]

---

[18] This confidential witness apparently worked for STEC from February 2006 through July 2009.  He was the Company's Regional Sales Manager for the San

**4.  The Securities Fraud Defendants' Failure To File The EMC Agreement With Form S-3 Registration Statements, After Promising The SEC That Any Material One-Off Contracts With EMC Would Be Filed, Is Additional Evidence Of Their Scienter With Respect To Their Misleading Statements About The EMC Agreement**

179.  Pursuant to Item 601(b)(10) of Reg. S-K and its instructions, "[e]very contract not made in the ordinary course of business [such as the EMC Agreement] which is material to the registrant," and, even if made in the ordinary course of business, "[a]ny contract upon which the registrant's business is substantially dependent" must be filed with the Form 10-Q or 10-K for the period during which the contract was executed.  Among other justifications for this requirement, disclosing to investors the terms of the contract protects them from being misled into believing that a significant one-time contract obtained, for example, by the registrant having made extraordinary promise, is indicative of an ongoing trend in the issuer's results of operations.

180.  Upon information and belief, to this day, the Securities Fraud Defendants have not caused STEC to file the $120 million EMC Agreement with the SEC as the Company was and is required to do.

181.  Moreover, no later than the end of August 2009, STEC and the Securities Fraud Defendants were on notice that failure to file a "one-off" contract of such central importance to its business as the EMC Agreement would be viewed as highly questionable by the SEC.  By letter dated August 28, 2009, the SEC wrote to STEC questioning, among other things, the Company's failure to file other, much smaller agreements with EMC that had been made during the previous year – when EMC accounted for a much smaller proportion of STEC's business than it accounted for in 2009.

---

Francisco Bay Areas and Pacific Northwest and reported to Mike Nilsson, STEC's Worldwide Vice President of Sales. Plaintiff alleges that to the extent Defendants Manouchehr and Mark were knowledgeable, Defendant Mike was as well.

182.   Thus, by letter dated August 28, 2009, the SEC asked why no "master agreement" with EMC, such as was referred to in STEC's 2008 10-K Annual Report, had been filed with that Form 10-K, given that, even at that early date, EMC already accounted for 15.2% of STEC's total revenues.

183.   STEC's only proffered defense for this earlier failure was an argument that the Company knew could not excuse its failure to file the EMC Agreement, which was of the utmost materiality to the statements made publicly with regard to it, including those made within the Company's S-3 Registration Statements filed with the SEC in connecting with the Offering.  Thus, by publicly filed letter, dated September 10, 2009, signed by Cook, the Securities Fraud Defendants responded to the SEC that, "STEC's master agreements typically are non-exclusive and ***do not contain any binding long-term volume commitments*** . . . actual sales of STEC products are made through more specific sales agreements such as individual purchase orders."

184.   The SEC was not satisfied with Cook's response which was, itself, deceptive.  Thus, by letter dated September 30, 2009, the SEC again wrote to STEC, stating

> "***[I]t remains unclear to us how you have concluded that you are not substantially dependent upon any of your agreements with . . . EMC Corporation***, such that they are not required to be filed pursuant to Item 601(b)(10)(ii)(B) of Regulation S-K.  We note your statements that STEC's master agreements typically are non-exclusive and that they do not contain any binding long-term volume commitments, and that actual sales are made through more specific sales agreements such as purchase order . . . ***With respect to any individual purchase order that accounted for a significant amount of the company's revenues, please advise how you concluded that any such purchase order is not required to be filed as a material contract under Item 601(b)(10)***."  [Emphasis added]

185.   By publicly filed letter dated October 13, 2009, and again signed by Cook, the Company responded that:

> "STEC received over 100 individual purchase orders from EMC related to 2008 deliveries. ***The amounts of these purchase orders ranged from $450 up to approximately $5.2 million for the largest***

***individual purchase order*** . . . As a result, STEC believes that none of the individual EMC purchase orders received for 2008 Shipments constitutes a material contract under Item 601(b)(10) of Regulation S-K." [Emphasis added]

186. Thus, the only excuse that Cook even attempted for the Company's failure to file any EMC agreement with the 2008 Form 10-K or the S-3 Registration Statements was that the largest actual purchase order by EMC during 2008 was for only $5.2 million. Obviously, such an argument could not possibly excuse STEC's failure to file the EMC agreement, since that agreement was for $120 million – an amount *23 times larger* than STEC's largest previous binding commitment from EMC.

187. Moreover, while the SEC expressed concern about STEC's failure to file any agreement with EMC during a period of 2008 in which EMC accounted for as much as *15.2%* of STEC's revenues, EMC's importance to STEC subsequently increased, until by the second quarter of 2009, EMC accounted for *38.9%* of STEC's revenues, as disclosed in STEC's Form 424B3 filed on August 3, 2009.

188. Significantly, STEC's September 10, 2009, letter to the SEC ended with a statement that "[***g)oing forward***, the Company will continue to assess each quarter whether it is depended upon anyone agreement such that an exhibit filing is required under Item 601(b)(10)(ii)(B)." [Emphasis added] Nevertheless, even after making this promise to the SEC, the Securities Fraud Defendants, each of whom had signed the Form S-3 Registration Statements, still failed to file the EMC Agreement – as they ***immediately*** should have done, attaching it to a Form 8-I.

189. By failing to file the EMC Agreement with STEC's 2009 second quarter Form 10-Q, or to file the Agreement with a Form 8-K immediately after receiving the SEC's August 28, 2009, letter, the Securities Fraud Defendants sent a misleading message to investors that the EMC Agreement did not need to be filed with the SEC, because it was a contract made in the ordinary course of business.

190. By failing to file the EMC Agreement, the Securities Fraud

Defendants also sent a misleading message that STEC's business was not "substantially dependent on" the EMC Agreement.  This second misleading message was reinforced by an explicit false statement made in Cook's September 10, 2009 letter to the SEC, that "in the unlikely event a customer should default under a purchase order or other sales agreement, including the EMC Agreement.

191.   The Securities Fraud Defendants' failure to file the EMC Agreement with the SEC was a material violation of Regulation S-K.  Moreover, their failure to so file it even after the Securities Fraud Defendants' failure to file the EMC Agreement with the SEC subsequent to the Commission's specific requests raises a strong inference that all of the Securities Fraud Defendants' false statements/omissions regarding EMC in the Offering Prospectus, in the S-3 Registration Statements and otherwise were made with an intention to conceal the full truth about the Agreement from investors.

### 5.    After Inflating the Price of STEC's Stock,  the Moshayedis Engaged in Massive Insider Selling

192.   After artificially inducing a doubling of the price of STEC stock from $18.02 per share on June3 16, 2009 to $35.50 per share on August 11, 2009 through illegal and/or otherwise deceptive means, and with specific knowledge of such manipulation, Defendants Manouchehr and Mark unloaded nine million shares of STEC common stock.[19]  This sale reaped a windfall for the Company's top two executives of $267.8 million in a single day, while their collective ownership of the Company decreased from 35.5% to 17.4%.

193.   The Moshayedis' stock sell-off was the biggest insider stock liquidation in the history of STEC, and a departure from the pattern of their other

---

[19]   Forms 4 filed by Defendants Mark and Manouchehr on August 13, 2009, list August 11 as the "Transaction Date" for the sale of all nine million shares.  The Offering was announced on August 3, 2009, priced on August 6, 2009, and closed on August 11, 2009. Mike and the Trusts also sold a large portion of their  STEC shareholdings.

recent sales of STEC stock. Defendant Manouchehr sold no stock in 2008 and sold only 400,000 shares in March 2009 for proceeds of $3 million.  Defendant Mark sold only 466,292 shares in June 2008 and another 400,000 shares in March 2009, for proceeds of $6.5 million and $3 million, respectively.  The number of shares sold by the Moshayedis in the Offering was collectively more than eleven times the number of shares they sold in the six months before the Relevant Period and nearly twenty times the number of shares they sold in all of 2008.

194.   The Moshayedis had been planning to sell STEC stock since shortly before making the first of their alleged misstatements and omissions.  Thus, on May 29, 2009, without mentioning anything about the magnitude of the STEC shares that would be sold, a STEC press release stated that Defendants Manouchehr and Mark had adopted "pre-arranged stock trading plans" under Rule 10b5-1 to sell a portion of their stock "over a period of 18 months." Approximately two weeks later, in furtherance of their plan and scheme to proceed with the Offering based upon artificially manipulated market prices, the Securities Fraud Defendants caused the Company to make the first misstatement during the First Relevant Period, when STEC issued its revised 2009 second quarter revenue guidance.[20]

195.   After the Securities Fraud Defendants had issued or caused to be issued their string of misstatements and the price of STEC's stock had doubled, on August 3, 20098, during STEC's second quarter earnings conference call, Cook announced that the Moshayedis had cancelled their 10b5-1 plans, and would sell their stock in a single secondary offering – which closed eight days later.

---

[20]  The Moshayedis' retired brother, Mike, STEC's former President, sold $25 million of his stock in the Company in June and July 2009, beginning the day after STEC issued its increased and falsely generated second quarter revenue guidance. Within one week after the announcement, Mike and his Trust unloaded over one million STEC shares.

196.   Subsequently, after the November 3, 2009, disclosures a commentator on the much-followed Seeking Alpha website observed that "the market found it too coincidental that top management made such a substantial sale of stock in the very quarter they blew up."

197.   During the November 3, 2009, conference call, another analyst asked Defendant Manouchehr "are you considering buying any [of the stock] back?"

198.   Still later, after the February 23, 2010, disclosures and the collapse of STEC's stock price to $10.27, a *Barron's* article sarcastically observed that the Moshayedis now "look[] prescient" for having "sold 9 million shares – at $31 a piece."

### 6.   As STEC's Stock Price Began to Collapse, the SEC Launched a Formal Investigation of the Moshayedis' Stock Sales

199.   Following STEC's November 3, 2009, disclosures, the SEC instituted a formal investigation into insider trading at STEC.  The Company's 2009 Form 10-K, filed on February 23, 2009, disclosed for the first time:

"The [SEC] is conducting a formal investigation involving trading in our securities.  Certain of our officers and employees, including our CEO [Manouchehr] and President [Mark], have received subpoenas in connection with the SEC's investigation."

On July 19, 2012, the SEC commenced the SEC Litigation against Defendant Manouchehr, alleging violations of the federal securities laws for the reasons alleged herein.

### 3.   Only Days After Disclosing the SEC Investigation, STEC Made Golden Parachutes Available to Certain of the Securities Fraud Defendants

200.   On February 26, 2010, just a few days after STEC informed the public that certain of its officers were under investigation by the SEC, the Company announced that it had terminated its existing Severance and Change in Control Agreements that provided additional benefits for the members of STEC senior management should they be terminated without cause or should they terminate

their own employment after a change in control at the Company.  These benefits included so-called "golden parachutes" – a prorated annual bonus and accelerated vesting of stock options – if they leave the Company within twelve months for a change of control. Such "golden parachutes" were *de facto* bribes to the affected members of management to protect against the knowledge that they had about the Securities Fraud Defendants' wrongdoing being revealed publicly. Such "golden parachutes" will thus be "opened" if the acquisition of STEC by Western and Lodi takes place as planned, generating additional unjustified benefits from the transaction for the Securities Fraud Defendants.

### 7. Each of the Securities Fraud Defendants' False Statements and Omissions Involved One of STEC's Core Operations

201.   Each of the Securities Fraud Defendants, by reason of his position as a senior-most officer and/or director of the Company, was involved in STEC's daily operations and/or had access to all material information regarding the Company's core operations.  Therefore, each of the Securities Fraud Defendants is presumed to have had knowledge of all material facts regarding STEC's core operations that were concealed from the public or misrepresented.

202.   Each of the false statements alleged herein involved a core operation of STEC.

203.   During the Company's August 3, 2009, earnings conference call, Cook referred to ZeusIOPS as STEC's "signature" product.  During the same conference call, Defendant Manouchehr made statements showing that STEC was forecasting ZeusIOPS revenue for the 2009 third quarter to comprise between 69% and 72% of STEC's total revenue. Each of the other Securities Fraud Defendants knew or should have known that such statements were false and intended to be misleading to the investing public.

204.   EMC was STEC's principal customer.  According to STEC's Form 424B3 filed on August 3, 2009, during the second quarter of 2009, EMC accounted

for 38.9% of all STEC's revenues.  During the November 3, 2009, conference call, Defendant Manouchehr stated "EMC still remains our top customer" and that EMC accounted for 90% of ZeusIOPS sales.

205.   STEC considered the other OEMs to be potentially as important to STEC as EMC.  Thus, during the August 3, 2009, conference call, Defendant Manouchehr referred to five top OEM customers, including EMC, as "low hanging fruit," and stated that "[w]e've only picked one fruit at this point, and there are four more fruits left."

206.   The Securities Fraud Defendants marketed STEC to investors as, first and foremost, a "growth" company – *i.e.*, a company producing steady revenue growth.  STEC posted on its website an article by Paul Shread, published on August 4, 2009, stating that "[t]he most interesting detail to come out of STEC's quarterly earnings report last night [*i.e.*, on August 3, 2009] is just how much growth may still lie ahead for the enterprise solid state (SSD) drive maker."

### 8.   Each Securities Fraud Defendant Had a Motive and Opportunity to Commit Fraud

207.   Defendants Manouchehr and Mark each had a motive to commit fraud in order to reap his roughly half share of the $267.8 million obtained from the Offering.  Of the 9 million shares sold in the Offering, 4.9 million were Defendant Mark's and roughly 4.1 million were Defendant Manouchehr's, separate and distinct from the STEC shares sold by Mike.

208.   Cook had a motive to commit fraud in order to please the Moshayedis and to retain his position with the Company.  Cook had been hired by STEC only nine months before the Offering – and, unlike the Moshayedis, was neither a direct nor a major shareholder.[21]  He therefore had a motive to curry favor with these two

---

[21] At the time of the Offering, Cook did not own any STEC stock.

1    brothers who had founded the firm, and who, individually and together,

2    represented unrivaled sources of influence and control within the Company.

3        209.   As the Company's most senior officers, and for the other reasons

4    detailed herein, Defendants Manouchehr, Mark and Cook had a clear opportunity

5    to commit fraud and did so.

6        210.   Although not an officer of the Company, Defendant Bahri, as a

7    Director and Chair of the Board's Audit Committee, was beholden to the

8    Moshayedis for his position and its perquisites and emoluments and thus

9    acquiesced in their wishes and "rubber stamped" everything they did.

10   **D**.    **The Securities Fraud Defendants' False And Misleading
11         Statements Violated The Exchange Act And Thereby Subjected
           STEC To Claims By Defrauded Investors**

12       211.   On June 16, 2009, the Securities Fraud Defendants caused STEC to

13   issue a press release containing revenue guidance for the 2009 second quarter of

14   "82-84 million."  As previously indicate, *supra,* this was an increase of $14 million

15   over the previous guidance issued for the 2009 second quarter.

16              **1.    July 16, 2009 Press Release**

17       212.   On July 16, 2009, the Securities Fraud Defendants caused STEC to

18   issue a press release stating that STEC had signed an agreement with "one of its

19   largest enterprise storage customers for sales of $120 million of ZeusIOPS SSDs in

20   the second half of 2009."  The press release also quoted Defendant Manouchehr's

21   statement that the agreement had been made possible by the fact that "sales of [the

22   purchaser's] enterprise storage system utilizing our Zeus IOPS drives have grown

23   significantly."

24              **2.    August 3, 2009, SEC Filings**

25                   **a.    2009 Second Quarter Earnings Release**

26       213.   On August 3, 2009, STEC was caused to issue its 2009 second quarter

27   earnings release which stated that the Company had signed a "$120 million

28   contract to supply ZeusIOPS SSDs to a major Enterprise-Storage customer for the

1    second half of 2009."

2        214.   STEC's 2009 second quarter earnings release also reported second

3    quarter revenue of $86.4 million, and failed to disclose what each of the Securities

4    Fraud Defendants knew or should have known that $14 million of this total was

5    comprised of unearned income and undisclosed "channel stuffing."

6                **b.    Form 424B3 (The Offering Prospectus)**

7        215.   On August 3, 2009, STEC filed a Form 424B3, the Offering

8    Prospectus, stating, among other things:

9

10           "We expect continued growth in the sales of our
             Flash-based SSD ZeusIOPS products through 2009
11           based on the accelerated adoption of our ZeusIOPS
             SSDs by most of our major enterprise-storage and
12           enterprise-server OEM customers into their
             systems."

13

14   The foregoing passage was a misstatement or material fact concerning the other

     OEMs, of which each of the Securities Fraud Defendants was or should have been

15   aware.  The foregoing passage also intentionally omitted material facts concerning

16   IBM.

17       216.   The passage quoted above also was part of the following, longer

18   passage, which was a misstatement/omission regarding the EMC Agreement:

19

20           "We expect continued growth in sales of our
             Flash-based SSD ZeusIOPS products through 2009
21           based on the accelerated adoption of our ZeusIOPS
             SSDs by most of our major enterprise-storage an
22           enterprise server OEM customer into their
             systems.  As part of this expected growth, on July
23           16, 2009 we announced an agreement with one of
             our largest enterprise-storage customers for sales
24           of $120 million of ZeusIOPS SSDs to be delivered
             in the second half of 2009."
25

26                **c.    Second Quarter 10-Q**

27       217.   On August 3, 2009, STEC was caused by the Securities Fraud

28   Defendants to file its 2009 second quarter 10-Q, which reported revenue for the

                                        68

second quarter of $86.4 million, and failed to disclose that $14 million of this total was comprised of unearned income and undisclosed "channel stuffing."

**3**. **September 10, 2009, Publicly Filed Letter to the SEC**

218.   On September 10, 2009, STEC publicly filed with the SEC a letter to the SEC, signed by Cook, stating that "in the unlikely event a customer [of STEC] should default under a purchase order or other sales agreements [with STEC], STEC generally believes it could find a replacement customer for the relevant product."

**G.     Additional Allegations Relating to the Underlying Exchange Act Claims**

**1.     The November 3, 2009, Partial Corrective Disclosures**

219.   In reaction to multiple partial corrective disclosures made after the market closed on November 3, 2009, shares of STEC common stock plunged $9.01 per share to close at $14.14 per share on November 4, 2009, a one-day decline of 39% on extraordinary volume of 32 million shares.

**a.     Disclosure That The EMC Agreement Was Not an Ordinary Course Contract Indicative of Purchases by EMC Expected to Recur**

220.   One substantial cause of the November 4, 2009, stock price decline was the disclosure that the $120 million EMC Agreement was a "one off" contract that had satisfied EMC's requirements for more than just the second half of 2009, and not an ordinary course of business contract indicative of a new, higher volume of recurring purchases by EMC.

221.   Thus, on November 4, 2009, in a report entitled, ***"Down for the Count After Last Night's Blindsided Knock Out Punch***," Wedbush slashed its STEC stock price target to $18 from $39 per share "following STEC's surprising revelation last night on its Q3 earnings call that its leading SSD customer (EMC) had likely built inventory of its flagship ZeusIOPS, "and cut its rating to "Neutral" from "Outperform."  Earlier that same day, but prior to STEC's startling

69

disclosure, Wedbush had reiterated an "Outperform" rating for STEC and assigned at $39 price target, emphasizing STEC's strong demand for ZeusIOPS at its leading Tier 1 customer EMC."

222.  On November 3, 2009, Oppenheimer slashed its STEC stock price target in half to $21 to $45, said "we would not be surprised if bears pounce," downgraded STEC from "Outperform" to Perform," and explained that "[t]he trouble is twofold," with one of the two problems being "sell-through at primary customer EMC."

223.  Also on November 4, 2009, a *Barron's* article titled "STEC crushed by EMC issue; three bullish analysts give up," stated that "STEC shares are being ravaged today after the company warned investors yesterday that excessive inventory of ZeusIOPS solid-state drives sold to customer EMC could hurt demand in the early part of 2010."

224.  On November 16, 2009, a commentator on the Seeking Alpha internet site concluded that a "major reason" for the "market reaction" to the November 3, disclosure regarding EMC was the appearance that a fraud had been perpetrated by STEC's management:

> **"Concern over management integrity and credibility**:
> Whether management knew about the demand/inventory issue in advance or not, **the market found it too coincidental** that top management made such a substantial sale of stock in the very quarter they blew up."

**b.    Disclosure That Sales to the Other OEMs Were Not Expected to Increase During the Second Half of 2009**

225.  A second substantial cause of the November 3, 2009, stock price decline was the disclosure that ZeusIOPS sales to the other OEMs were not expected to increase during the second half of 2009.

226.  Thus**,** a November 4, 2009, report by ABC *News/Money* led with the statement that "Shares of STEC, Inc. tumbled ahead of regular trading Wednesday

1    after the company gave a weak outlook for the rest of the year," noting that

2    revenue for the 2009 third quarter was "up, but "the company's revenue forecast

3    for the rest of the year fell short [of what] analysts polled by Thomson Reuters

4    were looking for."  Because the market had known since the 2009 third quarter

5    essentially what EMC's purchases would be in the 2009 fourth quarter (because

6    they had been determined by the EMC Agreement), it was the disclosure of the

7    falsity of STEC's stated expectation regarding fourth quarter sales to the other

8    OEMs that had caused the drop in STEC's stock price, according to this report.

9    227.   Similarly, the Oppenheimer report issued late on November 3, 2009,

10   which slashed its STEC stock price target in half to $21 from $45, said "[t]he

11   trouble is twofold: 1) self-through at primary customer EMC; and 2) *longer*

12   *inception in new business at HP/IBM*.  **Both** were linchpins of our Outperform

13   thesis; now they go out the window."

14   228.   Similarly, on November 4, 2009, JPMorgan cut its STEC stock price

15   target from $50 to $42, and stated that "STEC's stock stands to languish pending

16   greater clarity on the EMC and IBM ramps."

17   229.   As well, the November 4, 2009, *Barron's* article, which led with a

18   statement about the EMC Agreement, stated in its second sentence, "Adding to the

19   pressure, the company warned on its post-earnings conference call that business

20   has been slow as well at both IBM and Sun Microsystems."

21   230.   The November 4, 2009, Wedbush report which slashed its STEC

22   stock price target from $39 to $18 also saw the EMC issue as part of a bigger

23   problem involving STEC's other customers as well. The report focused on

24   "disappointing top line Q4 guidance," stated "we were completely caught off guard

25   by the stall in the adoption rates of SSDs and its negative impact to near-term

26   earnings and revenue," and advised that "investors move to the sidelines" until

27   there is greater visibility on, among other things, "customers production ramps" –

28   using the plural "ramps."

71

### c. Disclosure That IBM Was Not Expected to Begin Purchasing for Volume Production in the Second Half of 2009, and Was Not Offering ZeusIOPS as a Standard Feature in Its Systems

231. A third substantial cause of the November 3, 2009, stock price decline was the belated disclosure that the Securities Fraud Defendants who controlled all of STEC's public communications had no expectation that IBM would commence volume production of a ZeusIOPS during the second half of 2009, and that IBM was not selling ZeusIOPS as a standard feature in its systems.

232. On November 4, 2009, a B. Riley report on STEC that stated it was "taking down our numbers somewhat" focused on two primary concerns: the first was the disclosure that EMC had "excess" ZeusIOPS inventory, and the second was that "IBM, which still is expected to be the next storage customer to embrace SSDs in volume . . . is not generating meaningful revenues yet – in part, STEC dated, due to the fact that Big Blue is marketing the drives as an option vs. coming out leading upgrade sales efforts with SSDs."

233. As well, on November 4, 2009, a JPMorgan report that cut that analyst's STEC stock price target also stated that the two issues depressing the stock price were the need for "greater clarity on the EMC and IBM ramps."

234. Similarly, the November 4, 2009, *Barron's* article stated that "[a]dditional pressure" on the price of STEC's stock price was the result of the report that "business has been slow as well at both IBM and Sun Microsystems."

### d. Disclosure That No Other Customer Could Replace EMC Under the EMC Agreement

235. A fourth substantial cause of the November 4, 2009, stock price decline was the belated disclosure that, contrary to the statement in STEC's September 10, 2009, letter to the SEC, no other customer could replace EMC under the EMC Agreement, or, more generally, purchase ZeusIOPS at volumes similar to those being purchased by EMC under the Agreement. During the Company's November 3, 2009, conference call, Defendant Manouchehr confirmed

72

an analyst's statement that STEC's other large customers besides EMC "aren't selling to any degree yet" and added that they were all "*a year behind*" EMC. Defendant Manouchehr also disclosed that the customer most likely to make the next agreement similar to the EMC Agreement, namely, IBM, was not anywhere close to making such an agreement, that sales to IBM actually had declined during the third quarter, and that IBM was still offering ZeusIOPS as a mere option rather than a standard part of its systems.

236.   Thus, a November 4, 2009, report on STEC by ThinkEquity LLC downgraded STEC from "Buy" to "Hold," while noting that, as Defendant Manouchehr belatedly admitted during the November 3, 2009, conference call, the "other Storage OEMs [are] almost a year behind EMC in adopting SSDs."

237.   Similarly, a November 4, 2009, B. Riley report states it was "taking down our [valuation] numbers somewhat," after discussing the fact that IBM, was, as Defendant Manouchehr had stated during the Company's November 3, 2009, conference call, still "expected to be the next storage customer to embrace SSDs in volume . . . but is not generating meaningful revenues yet – in part, STEC stated, due to the fact that Big Blue is marketing the drives as an option vs. coming out and leading upgrade sales efforts with SSDs."

**2.     The February 23, 2010, Additional Corrective Disclosures**

238.   In reaction to the multiple corrective disclosures after the market closed on February 23, 2010, the price of STEC common stock dropped over 23% in trading on February 24, 2010, a decline of $3.15, on extraordinary volume over 36 million shares.

**a.     Additional Disclosure That the EMC Agreement Did Not Represent a New Recurring Level of EMC Purchases**

239.   One substantial cause of the February 24, 2010, stock price decline was STEC's disclosure that it did not expect "any meaningful production orders" from EMC during the first half of 2010.  Each of three different securities analysts

73

1   lowered their STEC stock price targets while explaining that, whereas they
2   originally had believed that the EMC agreement represented EMC's recurring
3   requirements for ZeusIOPS every six months, they now realized that EMC's
4   recurring requirements were only half that much.

5       240.   Thus, on February 24, 2010, Oppenheimer stated that "now that
6   EMC's supply contract with STEC for $120M is indicative of a full-year run rate
7   vs. half year we are . . . dropping our [price target] to $10 from $21."

8       241.   Similarly, on February 24, 2010, B. Riley lowered its STEC stock
9   target price from $29 to $16.38, while explaining that "this order was envisioned as
10  meeting six months of demand," but "STEC's new guidance indicates that it
11  expects EMC to take at least a whole year to work through its $120MM July 2009
12  order for ZeusIOPS SSDs."  In a comment reflection suspicion of STEC
13  management, the report added "[g]iven the drastic difference between actual and
14  expected end-customer demand, we have to wonder why STEC didn't work with
15  EMC and spread shipments over a longer time period – minimizing the disruption
16  all the way around."

17      242.   Similarly, on February 23, 2010, Deutsche Bank lowered its STEC
18  stock price target to $10 from $36, while stating "[w]e now see EMC revenue of
19  roughly $35M/Q in F2H-10, which we believe has been EMC's true demand over
20  the past few Qs."

21              **b.   Additional Disclosure That the Other OEM's Would Not Be
22              Increasing Their Purchases During the Second Half of 2009**

23      243.   A second substantial cause of the February 24, 2010, stock price
24  decline was STEC's belated disclosure that its ZeusIOPS sales to its customers
25  other than EMC during the fourth quarter of 2009, and indeed, during the entire
26  second half of 2009, were far below their quarterly level during the first half of
27  2009, and were not expected to recover even in the 2010 first quarter.

28      244.   Thus, on February 24, 2010, a Needham report on STEC stated it was

74

"[r]evising estimates lower once more" because, among other reasons, fourth

quarter ZeusIOPS revenue was "below our original estimate."  This meant revenue

from the other OEMs – not from EMC – was below what Needham had expected,

because its securities analyst had known since the third quarter what the amount of

fourth quarter revenues from EMC would be, because revenues from EMC for the

second half had been fixed by the EMC Agreement.

245.   Similarly, on February 24, 2010, JPMorgan lowered its STEC stock

price target to $12.50 from $42, after noting that STEC's 2010 first quarter revenue

guidance was more than $60 million below JPMorgan's prior estimate.  Because,

after STEC's November 3, 2009, disclosures, investors already knew that EMC

would not be purchasing as much as $60 million in the 2010 first quarter, at least a

portion of JPMorgan's prior overestimate of STEC's 2010 first quarter revenues

had been an overestimate of revenues from STEC's customers other than EMC.

JPMorgan commented that "the disappearance of sustainable revenue momentum

up-ended our prior view" and that "[t]he flow-through effects of this reset are

staggering to the overall model, which is why we are downgrading to Neutral."

**c.    Additional Disclosures That IBM Was Not Expected to Begin Purchasing for Volume Production in the Second Half of 2009**

246.   A third substantial cause of the February 24, 2010, stock price decline

was STEC's disclosure that, not only had IBM failed to commence volume

production during the second half of 2009, but also, that STEC had no expectation

of IBM commencing volume production at any specified time in the future.

247.   Thus, a Reuters report on STEC issued on February 24, 2010, stating

that "the company's shares [were] down 30 percent in extended trade" also

reported that "[i]ndustry watchers were anticipating an update on how customers

apart from EMC, like IBM Corp. were ramping in terms of using STEC's

products" and that Defendant Manouchehr had disclosed that "[a]ll of the other

customers are picking up slowly."

75

248.   The analysis presented, *supra*, regarding the Company's non-cancelable inventory purchase orders shows that, one of the reasons why, even at the end of 2009, IBM still was not ordering for full production was that, contrary to the impression conveyed by the Offering Prospectus, at the time of its issuance, the Securities Fraud Defendants had no expectations that IBM would transition toward ordering for volume production during the second half of 2009.

### d.   Additional Disclosure That No Other Customer Could Replace EMC Under the EMC Agreement

249.   A fourth substantial cause of the February 24, 2010, stock price decline was STEC's additional disclosure that none of its other customers, singly or even taken together, were capable of duplicating the kind of purchasing made by EMC under the EMC Agreement.

250.   Thus, in its February 23, 2010, report on STEC, Deutsche Bank stated that "[i]t sounds like IBM and other customers are ramping modestly, but for now, ***these customers will not be enough to offset lost EMC biz.***"

251.   Similarly, in the first sentence of its February 24, 2010, report on STEC, Needham stated, "the company remains heavily levered to pulls from its first and primary customer," and in the next sentence, Needham added that "the remaining customers [are] far behind in their own ramps."

### e.   Disclosure That The Securities Fraud Defendants Inflated STEC's 2009 Second Quarter Revenue and Revised Revenue Guidance

252.   A fifth substantial reason for the February 24, 2009, decline in the price of STEC's stock was its issuance of revenue guidance for the 2010 first quarter -- $33 million to $35 million – that was far below investors' expectations. A February 24, 2010, *Associated Press* article stated "shares of Stec Inc. plunged Wednesday after the maker of data storage devices said first-quarter revenue would be as much as 53 percent lower than what Wall Street expected."  A *Barron's* article by Eric Savitz also published on February 24, 2010, was titled "STEC

Wreck: Mass Downgrades on Rotten Guidance."  The reason for this decline was that revenue for the several preceding quarters had been artificially high.  Revenue for the 2009 third and fourth quarters had been boosted by the one-off EMC Agreement.

253.   While it has taken until 2010 to understand that multiple reasons why STEC's 2010 first quarter guidance was, to use *Barron's* term, "rotten," even at the time when the guidance was issued, securities analysts realized that the drop in revenue was caused by more than just a lack of sales to EMC, and that part of the problem was a lack of credibility on the part of STEC's management.

254.   Thus, on February 24, 2010, a JPMorgan report stated that "the *disappearance* of sustainable revenue momentum up-ended our prior view that STEC was the high *growth story* in SMidCap."  JPMorgan had labeled STEC "*the high-growth story* in our coverage universe" when it had initiated coverage of STEC – just one month after the Company had reported its 2009 second quarter revenue.

255.   On February 24, 2010, a Thomas Weisel Partners research report stated that "STEC's 1Q10 revenue guidance suggests to us current SSD adoption in Enterprise Storage application is well below previous estimates," and that the analyst was lowering its STEC stock price target because of "our loss of confidence in STEC management."

256.   On February 24, 2010, a *Barron's* article by Alexander Eule stated that "[g]iven STEC's abrupt first-quarter forecast, though, it could be a while before investors take the company at its word."  On the same day, another article in *Barron's*, this one by Eric Savitz, noted, sarcastically, that, among those who now looked "prescient" were "CEO Manouchehr Moshayedi, and his brother, president Mark Moshayedi, who last summer sold 9 million shares – at $31 apiece."

257.   In the wake of the series of belated disclosures that demonstrated the Securities Fraud Defendants' deception of the investing public, the Company (as

well as others) was sued by defrauded investors making well-founded allegations that ultimately cost and will continue to cost STEC massive defense and resolution expenses, all of which has been caused by the Securities Fraud Defendants' wrongdoing as alleged herein.

**E.     The SEC Complaint**

258.   On July 19, 2012, the SEC commenced the SEC Litigation against Defendant Manouchehr, alleging, based on many of the facts set forth herein, that he violated Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by engaging in a "fraudulent scheme . . . [of] insider trading and made false and misleading representations and omissions in connection with the sale of nine million shares of stock of STEC, Inc. in August 2009."  SEC Complaint at ¶¶ 3, 94-99.

259.   The SEC's claims against Manouchehr accused him of violating §17(a) of the Securities Act of 1933:

> "by engaging in the conduct described [in its Complaint as well as herein], directly or indirectly, in the offer or sale of securities by the use of means or instruments of transportation or communication in interstate commerce or by the use of the mails:
> a.   with scienter, employed devices, schemes, or artifices to defraud;
> b.   obtained money or property by means of untrue statements of a material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or
> c.   engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser."
> SEC Complaint at ¶95.

260.   As Plaintiff does herein, the SEC went on to accuse him of violating §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder:

> "by engaging in the conduct described [in its Complaint as well as herein] directly or indirectly, in connection with the purchase or sale of a security, by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange, with scienter:
> d.   employed devices, schemes, or artifices to defraud;
> e.   made untrue statements of material fact or omitted to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or
> f.   engaged in acts, practices, or courses of business which operated or

78

1

would operate as a fraud or deceit upon other persons." SEC Complaint at ¶98.

2

3

Although Manouchehr is the only defendant in the SEC Litigation, its defense is

4

being funded by STEC, causing further damage to the Company.

5

## VIII.  THE PROPOSED ACQUISITION OF STEC BY WESTERN AND LODI

6

7

261.   As the SEC Action and other litigation progressed against them, at

8

some time earlier in 2013 and prior to June 24, 2013 ("Second Relevant Period"),

9

Defendants Manouchehr and Mark consulted with their legal counsel and financial

10

advisors, BofA Merrill Lynch, with respect to the possible sale of STEC.

11

262.   Such consultation was, in part, in recognition of the deterioration of

12

the Company's core business since the commencement of the First Relevant Period

13

and its attendant impact on the value of STEC and, upon information and belief, to

14

develop a strategy in an attempt to avoid such Defendants' personal liability to

15

STEC in *Sokoloski I* and related shareholder derivative litigation.

16

263.   At some point during the Second Relevant Period, aided by BofA

17

Merrill Lynch, which is being paid on a contingent basis, the Moshayedis began

18

considering alternative plans to "take their money and run" and how best to avoid

19

liability for the claims asserted previously by Plaintiff and other STEC

20

shareholders. Indeed, they were specifically advised by their legal counsel that a

21

sale of the Company might well result in the shareholder derivative claims being

22

dismissed. In particular, sometime during the Second Relevant Period, the

23

Moshayedis' legal counsel, Latham & Watkins, informed them in substance

24

"should the merger of STEC into [another company] succeed, Plaintiffs' current

25

derivative claims will be extinguished.  Plaintiffs accordingly will be precluded

26

from seeking any damages on behalf of Nominal Defendant STEC."

27

### A.  Procedural Flaws in the Selling Process

28

264.   There were critical procedural flaws in the negotiation process

1  undertaken by the Individual Defendants to sell the Company.

2      265.   The negotiations by STEC with most of the potential suitors were

3  carried out in substantial part by Defendants Manouchehr and Mark, who were

4  hopelessly conflicted from acting in the best interests of STEC, due to the conflicts

5  created by their personal liabilities to the SEC, and to STEC itself, arising from

6  their defalcations during the First Relevant Period.

7      266.   The Individual Defendants caused STEC to enter into "standstill"

8  agreements with three of the six potential suitors (not including Western) with

9  whom STEC had discussions.  These standstill agreements generally restrict a

10 potential acquirer from taking various actions that relate to acquisition of control of

11 the target, such as making proposals to acquire the target, buying shares, and

12 launching a proxy contest.  The particular standstill agreements at issue, moreover,

13 contained "don't ask, don't waive" provisions, which prohibit a potential acquirer

14 from making any public or private request that a target waive the standstill

15 restrictions.  These restrictions are contrary to the best interests of a target

16 company's shareholders, because they decrease the possibility that alternative

17 acquirers will make enhanced bids for the target after they are initially outbid by a

18 rival.

19     **B. The Agreement is Unfair to STEC's Shareholders**

20         **1.  The Resulting Purchase Price is Inadequate, as Western Reduced
               its Offer from $9.15 to $6.85 Per Share, While Agreeing to
21             Provide Manouchehr with $20 Million of Indemnification and to
               Agree That He Will Never Have to Pay His Own Legal Fees**
22

23     267.   Following discussions among themselves, their legal counsel and

24 BofA Merrill Lynch, negotiations commenced with Western and its financial

25 advisor, Wells Fargo Securities, LLC with regard to a possible sale of the

26 Company to Western.

27     268.   On May 28, 2013, Western presented to the Moshayedis a $9.15 per

28 share, all-cash, offer for STEC. Three days later, the Board of STEC accepted the

$9.15 offer without even the benefit of any analysis of the Company including the very substantial claims it possesses against, *inter alia*, certain present and former officers and directors named here, present asserted derivatively by Plaintiff and other STEC shareholders..

269. Notwithstanding the $9.15 offer that had already been accepted by the Board, on June 23, 2013, STEC officially announced an offer of $6.85 per share from Western, $115 million less value than the original offer and 33.6% less than the already-approved $9.15 offer just 15 business days earlier.

270. The $9.15 offer required Defendant Manouchehr to release Western from damages arising from the SEC Litigation against him for fraud and insider trading.[22] As with the derivative claims of Plaintiff and other STEC shareholders, the SEC claims against Manouchehr eclipse Western's entire purchase price for the Company. Moreover, Defendant Manouchehr's legal expenses, just in 2013 alone, are estimated as high as $21.1 Million as reflected in STEC's Preliminary Proxy Statement on Schedule 14A filed with the SEC on or about July 25, 2013 and Definitive Proxy Statement on Schedule 14A filed with the SEC on or about August 8, 2013 (the "Proxy").

271. For the benefit of Moshayedis, and at least $115 million in damages to STEC shareholders, they undermined the $9.15 per share Board-accepted offer by notifying Western that a release from the Moshayedis would not be provided as part of the proposed transaction.

272. At that point, negotiations began between Defendants Manouchehr and Saman on the one hand and Western on the other to come up with an economic justification for Western to proceed and get protection from open-ended

---

[22] The SEC 's claimed damages will likely be in the hundreds of millions of dollars (disgorgement of $280 Million, at least the same amount in penalties, and also interest).

1    responsibility for Moshayedi-related liabilities and expenses.

2        273.   As a result of the more recent negotiations, Defendant

3    Manouchehr received two major side-deals from Western in order to close the deal

4    as reflected in Exhibit 99.5 of STEC's Form 8-K filed with the SEC on June 25,

5    2013.

6        274.   One of these side deals provided with an additional $20 Million cap

7    on liability for Western for the SEC Litigation. (Section 1, "Except for an

8    aggregate underlying total of up to $20,000,000 (the "Limit Amount"), [Defendant

9    Manouchehr] hereby fully releases and forever discharges the Company, …")

10       275.   In the second of such deals, the legal expenses for his insider trading

11   case would never have to be re-paid by Defendant Manouchehr (Section 4, "WDC

12   agrees, from and after consummation of the Merger, to pay the Legal Fees of

13   [Defendant Manouchehr's] existing counsel [Latham & Watkins LLP and Paul

14   Hastings LLP) …") which legal expenses are expected to be $22.1 million just for

15   2013 (as indicated in the Proxy), and which he would have to pay STEC/Western

16   back had he lost the SEC Litigation. Under this side deal, he will be relieved of the

17   obligation to repay STEC-advanced legal regardless of the outcome of the SEC

18   Litigation. Together with potential appeals costs, Defendant Manouchehr is likely

19   being relieved of tens of millions of dollars in legal fees, all at the expense of

20   STEC shareholders, who have lost over $100 million in value.

21       276.   Ultimately, shortly before June 24, 2013, the Moshayedis concluded

22   their negotiations with Western and reached an agreement for STEC to be sold to it

23   in an all cash deal, much of it going to the Moshayedi brothers.

24       277.   Given their control of STEC and its directors, the Board, on the

25   unanimous recommendation of a "special committee of independent directors"

26   whose members have not been publicly identified, unanimously approved the

27   merger agreement between STEC and Western and, not surprisingly, has resolved

28   to recommend that STEC shareholders approve the transaction at a shareholders'

1   meeting to be held to approve the merger agreement and the sale of the Company

2   to Western. At or about the same time, the directors and executive officers of

3   STEC also entered into separate voting agreements under which they have agreed,

4   subject to certain exceptions, to vote their respective STEC shares in favor of the

5   proposed transaction.

6        278.   On June 24, 2013, STEC and Western issued a joint press release

7   announcing to the public, *inter alia*, the acquisition of STEC in an all-cash

8   transaction nominally valued at approximately $340 million or $6.85 per STEC

9   share.  The merger transaction, which is subject to customary regulatory reviews, is

10  expected to close in the third or fourth calendar quarter of 2013.They nowhere

11  disclosed in such press release or in any filing with the SEC regarding the

12  proposed transaction the special benefits that they hoped would accrue to the

13  Moshayedis and no other STEC shareholders as discussed below. Defendants Mark

14  and Manouchehr  will have no ongoing role with STEC, should the transaction be

15  consummated. Western and STEC state that the specific post-close organization

16  structure will be determined as part of the integration planning process.

17       279.     The terms of the transaction with Western and its subsidiary are

18  manifestly unfair to most STEC shareholders since they are being deprived by the

19  Moshayedis and their confederates of the substantial value "left on the table;"

20  namely, the derivative claims of Plaintiff and other shareholders, which have a

21  value well in excess of the entire amount being paid for STEC by Western; i.e.

22  approximately $340 million. Moreover, if the strategy of the Moshayedis plays out

23  in the manner envisioned by their counsel, Latham & Watkins, works out as they

24  would like, in addition to the substantial cash they will receive for the remainder of

25  the STEC shares owned by them, Mike and the Moshayedi family trusts, such

26  Defendants will have the added and unjust benefit not being received by Plaintiff

27

28

1    and other STEC shareholders; namely, being relieved of potential liability of more

2    than $340 million in Plaintiff's and other shareholder derivative litigation.[23]

3        280.      In addition to the foregoing, as a former officer of STEC, Defendant

4    Manouchehr has an indemnification agreement with the Company. Under such

5    agreement, despite the magnitude and nature of his personal wrongdoing, STEC is

6    advancing Defendant Manouchehr's legal fees in the pending SEC Action, in

7    *Sokolowski I* and otherwise, and these payments will continue to be made even if

8    the proposed transaction closes for the duration of such litigation. At the same

9    time, Defendants Western and Manouchehr have separately agreed that, for any

10   liability resulting from the SEC action, the maximum exposure to STEC and

11   Western will be limited, although the amount of such limitation has not been

12   specified.

13       281.      The resulting price of $6.85 per share  is grossly inadequate because

14   it substantially undervalues the Company, as reflected in (1) the more substantial

15   purchase price Western Digital was willing to offer prior to the entry of the side

16   agreements with Manouchehr and even greater value of the Company when the

17   value of all the shareholder derivative claims are considered, and (2) the projections

18   contained in the Proxy that indicate management is expecting vastly improved

19   financial performance over the next four years, due, at least in part, to the

20   implementation of a more diversified marketing strategy to expand the Company's

21   customer base beyond its historical OEM customers, and to market to certain end

22   users directly.

23

24   _____

25   [23] Latham & Watkins has informed their clients that, "with respect to the existing
     derivative claims, should the merger succeed, Plaintiffs will lose standing as
26   putative derivative plaintiffs and Defendants will move for dismissal of the
     respective Complaints at that time. *See Grosset v. Wenaas*, 42 Cal. 4th 1100 (Cal.
27   2008) (holding, as a matter of California law, that derivative plaintiffs lack
     standing to litigate derivative claims when, as a result of a merger, they no longer
28   hold stock of the defendant corporation)."

1
2

## 2.    The Merger Agreement Contains Provisions Designed to Dissuade Rival Bidders

3      282.    Not only did the Board fail to maximize shareholder value in

4   agreeing to the proposed transaction and failing to approach any other potential

5   buyers or otherwise conduct any form of market check, the Merger Agreement

6   contains a number of onerous and preclusive provisions which make approval of

7   the Proposed Transaction a virtual *fait accompli.*

8      283.    First, the Board failed to negotiate for a "Go-Shop" provision. In

9   light of the Board's decision to initiate sales dialogue, and enter exclusive

10   negotiations with Unilever, a "Go-Shop" provision is the only way to ensure that

11   shareholders receive the highest value reasonably available for their shares. While

12   not a perfect substitute for a pre-signing auction, a "Go-Shop" provision could

13   serve a similar function by allowing the Board to canvas the market to determine

14   whether potential suitors are interested in making a competing bid.

15      284.    Instead of negotiating for a "Go-Shop" provision, the Board agreed

16   to a prohibitive "No Solicitation" clause (the "no shop" provision), further limiting

17   the Board's ability to entertain superior strategic alternatives. Specifically, the

18   Merger Agreement contains a strict "no shop" provision barring STEC from

19   soliciting any competing bids – despite the fact that the Individual Defendants had

20   failed to conduct a market check. The practical effect of this is that logically,

21   potential suitors  are now effectively deterred by these provisions from coming

22   forward with a competing offer and are therefore even less likely to pursue the

23   Company. Section 6.4(a) of the Merger Agreement expressly prohibits STEC from

24   soliciting competing proposals, engaging in negotiations with other parties, or

25   approving transactions with other parties.

26      285.    As written, the no-shop provision prevents STEC from even

27   encouraging competing bids for the Company. This is the very antithesis of

28   maximizing shareholder value, which is a core duty of directors of a publicly held

1   company.

2        286.     The "no shop" provision is already costing STEC shareholders the

3   opportunity to receive maximum value for their shares. Even though the

4   Company's stock has already traded above the Unilever Offer Price since the

5   Proposed Transaction was announced, the Board is barred from exploring strategic

6   alternatives to the Proposed Transaction.

7        287.     Second, § 6.4(e) of the Merger Agreement gives Western an

8   unlimited "Matching Right"  regarding any "Superior Proposal" to persuade the

9   Board to continue recommending the Proposed Transaction despite the emergence

10  of a superior offer.

11       288.     The Matching Right dissuades interested parties from making an

12  offer for the Company by providing Unilever the opportunity to make repeated

13  matching bids to counter any competing offers. Due to the complete absence of

14  any pre-signing market check, no justification exists for the inclusion of the

15  Matching Right and other bid advantages in the Merger Agreement.

16       289.     Third, § 8.3 of the Merger Agreement provides that STEC may be

17  required to pay an onerous termination fee of $9.4 million in the event the

18  Company were to accept a superior offer from another bidder. This termination

19  fee, coupled with the Individual Defendants' failure to ensure that the Company

20  was adequately shopped either before or after the signing of the Merger

21  Agreement, effectively precludes another bidder from submitting a superior offer

22  for the Company by driving up the cost of the acquisition. It also transfers money

23  to Western that otherwise would otherwise be available to be paid to STEC

24  shareholders as additional merger consideration.

25       290.     Fourth, to further assure that Western alone is able to purchase the

26  Company, concurrently with the execution of the Merger Agreement, STEC also

27  entered into a voting rights agreements that irrevocably binds the Company's

28  largest individual shareholders,  who collectively own approximately 12% of the

Company's shares, to vote in favor of the Proposed Transaction.

291.    Cumulatively, the "no shop" and "matching rights" provisions, the termination fee, and the  voting  agreements were all designed to effectively discourage bidders from making  a competing bid for the Company and prevent the Board from properly exercising their fiduciary duties to pursue and obtain the best available strategic alternative – and resulting maximum value – for STEC shareholders.

292.    The foregoing "deal protections" are simply unreasonable barriers to competing offers and substantially increase the likelihood that the Proposed Transaction will be consummated, leaving STEC public shareholders with limited opportunity to consider any superior offer.

293.    When viewed together, and in light of the now non-existent premium offered by the Proposed Transaction, these provisions cannot be justified as reasonable or proportionate measures to protect Western's investment in the transaction process.

### 3.    The  Merger Agreement Improperly Favors Company Insiders at the Expense of Shareholders

294.    The Agreement provides Company insiders with substantial incentives that will result in their enrichment at the expense of STEC shareholders.

295.    First, severance and change in control agreements agreed to by the Board with certain officers provide for substantial severance payments to those officers in certain circumstances in the event of a change in control of the Company – payments of 18 months' salary, and equal to one year's bonus.

296.    Second, STEC stock options will be assumed by Western and converted into Western stock options – options to purchase a security with considerably more liquidity than STEC's common stock.  This will disproportionately benefit insiders, who, according to the Proxy, collectively hold approximately $4.3 million in STEC options.

**D.  The False and Misleading Proxy**

297. In order to solicit support for the Merger, STEC mailed the Proxy in connection to the Merger to stockholders and filed it with the SEC on or about August 8, 2013. The Proxy fails to provide the Company's shareholders with material information and/or provides them with materially misleading information thereby rendering the shareholders unable to cast an informed vote regarding the Merger.

**1.  Failure to Provide a Meaningful Discussion of Claims Previously Asserted Derivatively on Behalf of STEC, Claims Asserted by the SEC, and the Defense of Those Claims**

298.   The most fundamental flaw with the Proxy is the failure to provide any discussion of the claims possessed by STEC directly and/or derivatively, and against, *inter alia*, certain of its present and former officers and/or directors, arising from the events of 2008-09 such as those alleged in *Sokolowski I*.

299.   The Proxy (at pp. 56, 61) contains a very  simple description of the nature of the claims, but nothing more.  The Proxy should have contained a detailed assessment of the value of the claims, which are undoubtedly the most valuable asset possessed by the Company, assets not even considered in the rendering of the opinion as to the purported fairness of the proposed merger.

300.   The Proxy also fails to disclose the potential loss of this asset upon the consummation of the proposed Merger. [24] The Proxy states that the shareholders who have brought these actions "may" lose standing (Proxy, at 56) to continue to litigate them.  The truth is that they inevitably will lose such standing to pursue the Company's claims derivatively, since the proposed Merger is on a "cash out" basis

---

[24] Plaintiff takes the position that, should the merger take place as planned, the present claims asserted derivatively may, with the Court's approval, be converted to a claim on behalf of at least certain of STEC's shareholders. Conversely, Defendants' counsel takes the position that, should the merger be consummated, all of STEC's claims, both direct and derivatively asserted, will be terminated.

(as opposed to a stock-for-stock merger, after which a "double derivative" action might be possible).   The Proxy also contains the false and misleading statement that the Company might elect to prosecute the claims it possesses, which is patently false based on the fact that the indemnification and other side agreements described herein render that a practical impossibility, and the expiration of the claims under applicable statutes of limitations make it a legal impossibility. Moreover, notwithstanding such a deceptive statement, the Defendants, including Western and Lodi, have absolutely no intention of pursuing any such claims. If the pending derivative actions are terminated by effect of the Merger, STEC's claims will, for all intents and purposes, be lost, at least in their present derivative form.

301.   The Proxy also fails to describe in any detail the action commenced by the SEC against Manouchehr.  It also fails to disclose the attorneys' fees incurred to date in defending that action, as well as those fees incurred in defending the factually related securities litigation and shareholder derivative litigation.

## 2.  Inadequate Financial Disclosures

302.   The financial disclosures included in the Proxy are deficient in a number of material respects.  As discussed below, the Proxy fails to disclose the underlying methodologies, projections, key inputs, and multiples relied upon and observed by the Company's financial advisor, BofA Merrill Lynch, so that shareholders can properly assess the credibility of the various analyses performed by the advisors and relied upon by the Board in recommending the Proposed Transaction. Moreover, BofA Merrill Lynch, in opining as to the purported fairness of the transaction is not and cannot legitimately be regarded as being objective and neutral given that its compensation and the amount thereof are contingent upon the consummation of the transaction.

### a. Internal Projections by Management

303.   The financial projections for STEC for its fiscal years 2013 through 2017 prepared by the Company's management were incomplete and should have further included the following items:

(a) Taxes (or tax rate);

(c) Stock-based compensation expense;

(d) Changes in net working capital;

(e) Capital expenditures;

(f) Unlevered free cash flow.; and

(g) Pending sales contracts with STEC customers.

### b.   Material Omissions Concerning BofA Merrill Lynch's Financial Analyses

304.   With respect to the "*Selected Publicly Traded Companies Analysis*," the Proxy should disclose the criteria BofA Merrill Lynch used in selecting the list of publicly traded companies as well as the ratios and multiples selected and applied by BofA Merrill Lynch in its analysis.

305.   With respect to the "*Selected Publicly Traded Companies Analysis*," the Proxy should also have disclosed the following material information concerning each of the selected "comparable" companies:   (a) Enterprise Value/Revenue based on projected revenues for 2013, 2014 and 2015, and (b) Enterprise Value/EBITDA based on projected EBITDA for 2013, 2014 and 2015.

306.   In addition, with respect to the "*Selected Publicly Traded Companies Analysis*," the Proxy should have disclosed the implied equity values per share derived by BofA Merrill Lynch for STEC for each of the following multiples:  : (a) Enterprise Value/Revenue based on projected revenues for 2013, 2014 and 2015, and (b) Enterprise Value/EBITDA based on projected EBITDA for 2013, 2014 and 2015.

307.   In addition, with respect to the "*Selected Publicly Traded Companies Analysis*," the Proxy should have disclosed any projections from STEC's public forecast (referred to as "Street Case" projections) relied upon in BofA Merrill Lynch's analysis.

308.   With respect to the "*Discounted Cash Flow Analysis*," the Proxy should disclose the following material information:

(a) BofA Merrill Lynch's definition of unlevered free cash flow;

(b) Whether BofA Merrill Lynch treated the stock-based compensation as a cash or non-cash expense;

(c) The inputs and assumptions used by BofA Merrill Lynch to derive the discount rates range of 14.0% to 18.0% used in its analysis.

(d) The ranges of implied equity values per share derived using the perpetuity growth rate method and the terminal EBITDA multiple method, individually.

309.   With respect to the "*Selected Precedent Transactions Analysis*," the Proxy should have disclosed the following material information:

(a) The criteria BofA Merrill Lynch used to select the transactions used; and

(b) The specific multiples observed for each of the selected transactions, including the Enterprise Value / last-twelve-months ("LTM") Revenue multiples and the Enterprise Value / LTM EBITDA for each of the selected precedent transactions.

### 3.  Material Misrepresentations and Omissions Concerning the Negotiation and Deliberation Processes

310.   The Proxy should have disclosed the following information pertaining to the negotiation and deliberation processes leading up to the approval of the Merger:

(a)   A discussion of all of the strategic alternatives discussed by the Board in the fourth quarter of 2012, beyond those few alternatives referenced in the Proxy (Proxy, at 24).

(b)   An explanation of why the Company was unsuccessful in retaining an investment adviser in the fourth quarter of 2012 and a description of the "feedback" received from potential advisers;

(c)   An explanation of the powers of the "Special Committee" formed by the Board in February 2013;

(d)   A discussion of all of the strategic alternatives discussed by the Board in February 2013;

(e)   A discussion of the purpose of entering severance and change in control agreements with Messrs. Cook and Saman;

(f)   An explanation of why Mark and Manouchehr were not precluded, by virtue of the conflicts of interest arising from their personal liability to the Company and role in the conduct giving rise to the SEC Action, from representing the Company in discussions with potential merger partners and/or other strategic partners.

(g)   A discussion of all of the strategic alternatives discussed by the Board in March 2013, beyond those few alternatives referenced in the Proxy (Proxy, at 27).

(h)   The Proxy does not explain why the Company entered into nondisclosure agreements with some potential acquirers and not others, and why some, but not all, of the nondisclosure agreements contained standstill clauses.

(i)   The Proxy does not explain why Western, as of May 31, 2013, was no longer interested in pursuing discussions with STEC, beyond the

92

ambiguous reference to purported "internal concerns" at Western, which concerns are not described.

(j)    The Proxy does not explain why, when Western resumed its discussions with STEC, it was interested only in pursuing the acquisition at a considerably lower price point.

(k)    The Proxy does not disclose what strategic alternatives, if any, were being considered by the Board at the time that Western informed STEC that it was only interested in going forward at a significantly reduced price.

(l)    The Proxy does not describe with adequate precision the timing and substance of inquiries from potential rival bidders (Companies A through H), leaving shareholders with insufficient information with which to evaluate whether the Individual Defendants made an adequate effort to obtain maximum value for their shares, nor whether more valuable consideration could have been obtained for their shares.

### 4. The Company's Relationship With BofA Merrill Lynch

311.   The Proxy should have disclosed the following material information concerning the Company's retention of BofA Merrill Lynch:

(a) The basis for retaining BofA Merrill Lynch as the Company's financial advisor to evaluate the Proposed Transaction;

(b) The amount of fees paid to BofA Merrill Lynch; and

(c) The extent to which such fees are contingent upon the consummation of the Proposed Transaction.

## IX.   CLASS ACTION ALLEGATIONS

312.   Plaintiff brings this action on his own behalf and as a class action pursuant to Rule 23, Federal Rules of Civil Procedure, on behalf of all holders of

STEC common stock who are being and will be harmed by the actions of the Defendants during the Second Relevant Period as described above (the "Class"). Excluded from the Class are Defendants herein and any person, trust, corporation or other personally affiliated entity related to any of the Defendants.

313.   This action is properly maintainable as a class action because: (a) the Class members are so numerous that joinder of all of them is impracticable. As of June 24, 2013, there were more than 46.8 million shares of STEC common stock issued and outstanding. The actual number of Class members will be ascertained through discovery. (b) there are questions of law and fact that are common to the Class, including: (i) whether the Individual Defendants have breached their fiduciary duties with respect to Plaintiff and the other members of the Class during the Second Relevant Period in connection with the Proposed Transaction; (ii) whether the Proposed Transaction is in the best interests of Plaintiff and the members of the Class; (iii) whether the Individual Defendants have breached their fiduciary duty to obtain the best price available for the benefit of Plaintiff and the other members of the Class in connection with the Proposed Transaction; (iv) whether the Moshayedis and the Trusts are being unjustly enriched by the proposed merger and whether they are obtaining substantial benefits from it not available to the members of the Class; (v) whether Plaintiff and members of the Class are entitled to have the proposed transaction enjoined; and (vi) whether Plaintiff and the other members of the Class would suffer irreparable injury were the Proposed Transaction to be consummated.

314.   Plaintiff is an adequate representative of the Class, and has retained competent counsel experienced in complex litigation of this nature and will fairly and adequately protect the interests of the Class.

315.   Plaintiff's claims are typical of the claims of the other members of the

Class and Plaintiff does not have any interests adverse to the Class.

316.   The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the party opposing the interests of the Class.

317.   During the Second Relevant Period, the Defendants have acted on grounds generally applicable to the Class with respect to the facts and circumstances complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## COUNT I
### Breach of Fiduciary Duty
### (Against the Individual Defendants)

318.   Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

319.   By the acts, transactions and courses of conduct alleged herein, the Individual Defendants are attempting to unfairly deprive Plaintiff and other members of the Class of the true value of their investment in STEC.

320.   By the acts, transactions and courses of conduct alleged herein, the Individual Defendants have failed to exercise ordinary care and diligence in the exercise of their fiduciary obligations toward Plaintiff and the Class.

321.   As demonstrated by the allegations above, the Individual Defendants have breached their duties of care, loyalty, candor, good faith, and independence owed to the public shareholders of STEC because, among other reasons, they have failed to take steps to maximize the value of STEC to its public shareholders and/or are attempting to improperly put their personal interests ahead of the interests of STEC shareholders.

322.   As a result of the actions of the Individual Defendants, Plaintiff and

1    the Class will suffer irreparable injury in that they will not receive their fair portion

2    of the value of STEC's assets and businesses and will be prevented from obtaining

3    fair value for their investment.

4        323.   The Individual Defendants have capitulated to the Moshayedis' self-

5    serving importuning and are not acting in good faith toward Plaintiff and the other

6    members of the Class. Unless the Individual Defendants are enjoined by the Court,

7    they will continue to breach their fiduciary duties owed to Plaintiff and the

8    members of the Class, to the irreparable harm of the members of the Class.

9        324.   Plaintiff and the members of the Class have no adequate remedy at

10   law. Only through the exercise of this Court's equitable powers can Plaintiff and

11   the Class be fully protected from the immediate and irreparable injury which the

12   Individual Defendants' actions threaten to inflict.

13

14                                    **COUNT II**
                       **Aiding and Abetting Breaches of Fiduciary Duty**
15                       **(Against Defendants Western and Lodi)**

16       325.   Plaintiff incorporates by reference and re-alleges each and every

17   allegation contained above, as though fully set forth herein.

18       326.   Western and Lodi, which negotiated the terms of the proposed sale of

19   the Company under the circumstances alleged above, *de facto* conspired with the

20   Moshayedi brothers to create a transaction that would give them the ability to

21   argue that the derivative claims set forth by Plaintiff in *Sokolowski I* and otherwise

22   should be terminated.

23       327.   Defendants Western and Lodi have acted and are acting with

24   knowledge of, or with reckless disregard to, the fact that the Individual Defendants

25   are in breach of their fiduciary duties to STEC's public shareholders, and have

26   participated in such breaches of fiduciary duties.

27       328.   Defendants Western and Lodi have knowingly aided and abetted the

28   Individual Defendants' wrongdoing alleged herein. In so doing, Defendants

                                          96

rendered substantial assistance in order to effectuate the Merger Agreement in breach of the Individual Defendants' fiduciary duties.

329.   As such, Defendants Western and Lodi have aided and abetted the breaches of fiduciary duty by the Individual Defendants and are assisting them in being unjustly enriched.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

**A.** Awarding compensatory damages in favor of Plaintiff and the Class against the Defendants jointly and severally, for all damages sustained as a result of such Defendants' wrongdoing in an amount to be proven at trial, including interest thereon;

**B.** Should the sale of the Company not be consummated, directing STEC to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect STEC and its shareholders from a repeat of the damaging events described herein;

**C.** Enjoining the consummation of the proposed sale of the Company as described herein.

**D.** Appointing a Special Master or Trustee to oversee the STEC Board in connection with the proposed sale of the Company including insuring that STEC's future communications with shareholders are full compliance with applicable disclosure law;

**E.** Awarding Plaintiff his reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

**F.** Awarding such other and further relief as the Court may deem just and proper.

1    **XIII. JURY DEMAND**

2         Plaintiff demands a trial by jury on all issues so triable.

3

4    DATED: August 19, 2013          CUNEO GILBERT & LADUCA LLP

5

6                                    _____
                                     Sandra W. Cuneo (SB No. 110388)
                                     scuneo@cuneolaw.com
7                                    11620 Wilshire Boulevard, Suite 900
                                     Los Angeles, CA 90025
8                                    Telephone: (310) 582-5939

9

10                                   GREENFIELD & GOODMAN, LLC
                                     Richard D. Greenfield
                                     Ilene Freier Brookler (SB No. 269422)
11                                   ibrookler@gmail.com
                                     250 Hudson Street-8th Floor
12                                   New York, NY 10013
                                     (917) 495-4446

13

14                                   CUNEO GILBERT & LADUCA LLP
                                     Jonathan W. Cuneo
15                                   jonc@cuneolaw.com
                                     Matthew E. Miller
16                                   mmiller@cuneolaw.com
                                     507 C Street, N.E.
17                                   Washington, DC 20002
                                     (202) 789-3960

18

19

20

21

22

23

24

25

26

27

28

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES JUDGES

This case has been assigned to District Judge _____Andrew J. Guilford_____ and the assigned Magistrate Judge is _____Frederick F. Mumm_____ .

The case number on all documents filed with the Court should read as follows:

### SACV 13-01277 AG (FFMx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge.

Clerk, U. S. District Court

August 21, 2013
_____
Date

By  D. Vo
    _____
    Deputy Clerk

---

### NOTICE TO COUNSEL

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

**Subsequent documents must be filed at the following location:**

| ☐ Western Division | ☒ Southern Division | ☐ Eastern Division |
|---|---|---|
| 312 N. Spring Street, G-8 | 411 West Fourth St., Ste 1053 | 3470 Twelfth Street, Room 134 |
| Los Angeles, CA 90012 | Santa Ana, CA 92701 | Riverside, CA 92501 |

**Failure to file at the proper location will result in your documents being returned to you.**

---

CV-18 (08/13)                NOTICE OF ASSIGNMENT TO UNITED STATES JUDGES

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
CIVIL COVER SHEET

| I (a) PLAINTIFFS (Check box if you are representing yourself ☐)<br>WILLIAM A. SOKOLOWSKI, individually and on behalf of a class of persons similarly situated | DEFENDANTS<br>Western Digital Corp.<br><br>(additional defendants listed on Addendum) |
|---|---|
| **(b)** Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)<br>Sandra W. Cuneo, CUNEO GILBERT & LADUCA LLP. 11620 Wilshire Boulevard, Suite 900, Los Angeles, CA 90025; (310) 582-5939<br>(additional attorneys listed on addendum) | Attorneys (If Known)<br>Christopher W. Johnstone, Latham and Watkins, 505 Montgomery Street, Suite 2000; San Francisco, CA 94111; 415-391-0600<br>Expected to represent all defendants except Western Digital Corp. and Lodi Ventures (additional attorneys listed on addendum) |

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff   ☐ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant   ☑ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☑ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☑ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☑ 1 Original Proceeding   ☐ 2 Removed from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from another district (specify):   ☐ 6 Multi-District Litigation   ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT:**   **JURY DEMAND:** ☑ Yes  ☐ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☑ Yes  ☐ No    ☐ **MONEY DEMANDED IN COMPLAINT: $**_____

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
15 USC §§ 78j and 78t(a)

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS<br>PERSONAL INJURY | TORTS<br>PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 530 General | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 535 Death Penalty | |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | BANKRUPTCY | ☐ 540 Mandamus/ Other | ☐ 740 Railway Labor Act |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation |
| ☐ 480 Consumer Credit | ☐ 151 Medicare Act | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 555 Prison Condition | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 490 Cable/Sat TV | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 355 Motor Vehicle Product Liability | CIVIL RIGHTS | FORFEITURE / PENALTY | PROPERTY RIGHTS |
| ☐ 810 Selective Service | | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 610 Agriculture | ☐ 820 Copyrights |
| ☐ 850 Securities/Commodities/Exchange | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 362 Personal Injury-Med Malpractice | ☐ 442 Employment | ☐ 620 Other Food & Drug | ☐ 830 Patent |
| ☐ 875 Customer Challenge 12 USC 3410 | ☑ 160 Stockholders' Suits | ☐ 365 Personal Injury-Product Liability | ☐ 443 Housing/Acco-mmodations | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 840 Trademark |
| ☐ 890 Other Statutory Actions | ☐ 190 Other Contract | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | ☐ 630 Liquor Laws | SOCIAL SECURITY |
| ☐ 891 Agricultural Act | ☐ 195 Contract Product Liability | INMIGRATION | ☐ 445 American with Disabilities - Employment | ☐ 640 R.R. & Truck | ☐ 861 HIA (1395ff) |
| ☐ 892 Economic Stabilization Act | ☐ 196 Franchise | ☐ 462 Naturalization Application | ☐ 446 American with Disabilities - Other | ☐ 650 Airline Regs | ☐ 862 Black Lung (923) |
| ☐ 893 Environmental Matters | REAL PROPERTY | ☐ 463 Habeas Corpus-Alien Detainee | ☐ 440 Other Civil Rights | ☐ 660 Occupational Safety /Health | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 894 Energy Allocation Act | ☐ 210 Land Condemnation | ☐ 465 Other Immigration Actions | | ☐ 690 Other | ☐ 864 SSID Title XVI |
| ☐ 895 Freedom of Info. Act | ☐ 220 Foreclosure | | | | ☐ 865 RSI (405(g)) |
| ☐ 900 Appeal of Fee Determi-nation Under Equal Access to Justice | ☐ 230 Rent Lease & Ejectment | | | | FEDERAL TAX SUITS |
| ☐ 950 Constitutionality of State Statutes | ☐ 240 Torts to Land | | | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| | ☐ 245 Tort Product Liability | | | | ☐ 871 IRS-Third Party 26 USC 7609 |
| | ☐ 290 All Other Real Property | | | | |

**FOR OFFICE USE ONLY:**   Case Number: **SACV 13 - 01277 AG (FFMx)**

**AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.**

**WILLIAM A. SOKOLOWSKI v. WESTERN DIGITAL CORP., et al.,**
Addendum to Civil Cover Sheet

**Part 1(a)**
**Additional Defendants:**

LODI VENTURES, INC., KEVIN C. DALY, MANOUCHEHR MOSHAYEDI, MEHRDAD MOSHAYEDI, RAJAT BAHRI, F. MICHAEL BALL,  MATTHEW WITTE,  CHRISTOPHER COLPITTS, and STEC, INC.

**Part 1(b)**

**Additional Plaintiff's Attorneys:**

GREENFIELD & GOODMAN, LLC
Richard D. Greenfield
whitehatrdg@earthlink.net
Ilene Freier Brookler (SB No. 269422)
ibrookler@gmail.com
250 Hudson Street-8th Floor
New York, New York 10013
Telephone: (917) 495-4446

CUNEO GILBERT & LADUCA, LLP
Jonathan W. Cuneo
jonc@cuneolaw.com
Matthew E. Miller
mmiller@cuneolaw.com
507 C Street, N.E.
Washington, D.C. 20002
Telephone:  (202) 789-3960

**1(c) Additional Attorneys for Defendants:**

Carolyn A Dawes, Michele D Johnson
LATHAM & WATKINS LLP
650 Town Center Drive 20th Floor
Costa Mesa, CA 92626
714-540-123

Patrick E Gibbs
LATHAM & WATKINS LLP
140 Scott Drive
Menlo Park, CA 94025
650-463-4696

Meryl L. Young
Jennifer Boschee
GIBSON, DUNN & CRUTCHER LLP
3161 Michelson Drive
Irvine, CA 92612-4412
Tel: (949) 451-4229

*Some or all of the foregoing attorneys are expected to represent Defendants STEC, Inc., Kevin C. Daly, Rajat Bahri, F Michael Ball, ChristopherW Colpitts, Manouchehr Moshayedi, Mehrdad Moshayedi and Matthew L. Witte*

Stephen D. Hibbard
SHEARMAN & STERLING LLP
Four Embarcadero Center, Suite 3800
San Francisco, California 94111-5994
Tel: (415) 616-1174

*Attorneys Expected to Represent Defendants Western Digital Corporation and Lodi Ventures, Inc.*

**IX(b) – counties believed to be the counties of residence of each defendant, based on Plaintiffs' public records research:**

WESTERN DIGITAL CORP. (Orange), LODI VENTURES, INC. (Orange), MANOUCHEHR MOSHAYEDI (Orange), MEHRDAD MOSHAYEDI (Orange), KEVIN C. DALY (Orange), RAJAT BAHRI (Santa Clara), F. MICHAEL BALL (Madera), MATTHEW WITTE (Orange), CHRISTOPHER COLPITTS (San Francisco), STEC, INC. (Orange)